**In re PFOHL BROTHERS LANDFILL LITIGATION.**

**This Document Relates to All Actions.**

No. 95–CV–0020A.

United States District Court,
W.D. New York.

Oct. 27, 1998.

**516**

Baron & Budd, P.C. (Frederick M. Baron, of counsel), Dallas, TX, Lipsitz, Green, Fahringer, Roll, Salisbury & Cambria LLP (Laraine Kelley, of counsel), Buffalo, NY, for Plaintiffs.

Nixon, Hargrave, Devans & Doyle LLP (Laurie Styka Bloom, of counsel), Buffalo, NY, for Liason Group, Defendants.

## ORDER

ARCARA, District Judge.

This case was referred to Magistrate Judge Leslie G. Foschio, pursuant to 28 U.S.C. § 636(b)(1), on February 16, 1996. On June 10, 1997, defendants filed a motion for partial summary judgment. On March 11, 1998, Magistrate Judge Foschio filed a Report and Recommendation, recommending that: (1) defendants' motion for partial summary judgment be granted in part and that the survival actions pertaining to decedents Anthony J. Marino, Isabelle A. Wiedenbeck and Joseph J. Wiedenbeck be dismissed; (2) summary judgment be denied as to the survival actions of Mary Jane Farino, Robert L. Farino, Stephen C. Grandillo, Nelson M. Hirsch, Henry A. Kuczka, George Pagels and Leo N. Phillips; (3) the survival and wrongful death actions commenced on behalf of Evo T. Astor, Charles W. Batt, Rose E. Batt, Loraine E. Brezezicki, Gretchen A. Heaney, Joseph A. Inzinnia, Robert A. Martzolf, Vincent J. Mongiovi, Alfred G. Mucha and Mary M. Sturm, decedents for whom no personal representative had been duly appointed prior the action being filed, be dismissed with leave to renew; (4) summary judgment as to the remaining wrongful death actions be denied; (5) summary judgment as to the punitive damages claims be granted in part and denied in part; and (6) summary judgment as to the claims for loss of consortium be denied.

On April 24, 1998, plaintiffs Irene M. Marino and Joseph J. Wiedenbeck filed objections to the Report and Recommendation. Defendants also filed objections to the Report and Recommendation on April 24, 1998. Oral argument on the objections was held on September 20, 1998.

Pursuant to 28 U.S.C. § 636(b)(1), this Court must make a *de novo* determination of those portions of the Report and Recommendation to which objections have been made. Upon a *de novo* review of the Report and Recommendation, and after reviewing the submissions and hearing argument from the parties, the Court adopts the proposed findings of the Report and Recommendation.

Accordingly, for the reasons set forth in Magistrate Judge Foschio's Report and Recommendation: (1) defendants' motion for partial summary judgment is granted in part and the survival actions pertaining to decedents Anthony J. Marino, Isabelle A. Wiedenbeck and Joseph J. Wiedenbeck are dismissed; (2) summary judgment is denied as to the survival actions of Mary Jane Farino, Robert L. Farino, Stephen C. Grandillo, Nelson M. Hursch, Henry A. Kuczka, George Pagels and Leo N. Phillips; (3) the survival and wrongful death actions commenced on behalf of Evo T. Astor, Charles W. Batt, Rose E. Batt, Loraine E. Brezezicki, Gretchen A. Heaney, Joseph A. Inzinnia, Robert A. Martzolf, Vincent J. Mongiovi, Alfred G. Mucha and Mary M. Sturm, decedents for whom no personal representative had been duly appointed prior to the action being filed, are dismissed with leave to renew; (4) summary judgment as to the remaining wrongful death actions is denied; (5) summary judgment as to the punitive damages claims is granted in part and denied in part; and (6) summary judgment as to the claims for loss of consortium is denied.

This case is referred back to Magistrate Judge Foschio for further proceedings.

IT IS SO ORDERED.

### REPORT and RECOMMENDATION

FOSCHIO, United States Magistrate Judge.

#### JURISDICTION

This case was referred to the undersigned by the Honorable Richard J. Arcara on February 16, 1996, for report and recommendation on all dispositive motions. It is presently before the court on Defendants' motion for partial summary judgment (Doc. # 288), filed June 10, 1997.

#### BACKGROUND

This action was commenced on January 10, 1995, by the filing of the first of seven essentially identical complaints on behalf of sixty-seven plaintiffs, suing on behalf of themselves or their respective decedents, in which Plaintiffs seek monetary damages including punitive damages from Defendants for injuries or deaths from various cancers which they contend were caused by exposure to hazardous and toxic substances from the Pfohl Brothers Landfill located in Cheektowaga, New York (the "Landfill").[1] The death actions were filed by the widows, widowers, children or estate representatives of decedents. Plaintiffs allege that they or their decedents lived, worked or engaged in recreational activity in the vicinity of the Landfill and that Defendants either owned and operated the Landfill or were otherwise responsible for the generation or transportation of the hazardous substances to the Landfill. Plaintiffs' claims are based on state law negligence, strict liability, gross negligence, loss of consortium, and wrongful death.

The instant motion seeks summary dismissal of the survival actions and wrongful death claims asserted on behalf of twenty decedents, most of which would be time-barred under New York law. Plaintiffs urge that these claims are timely under the provision of the Comprehensive Environmental Response, Compensation and Liability Act of 1980. 42 U.S.C. § 9601 *et seq.*, ("CERCLA"), as amended by the Superfund Amendments and Reauthorization Act of 1986 ("SARA"), 100 Stat. 1613, specifically, § 309, 42 U.S.C. § 9658, which preempts the accrual date for state law toxic tort actions based on exposure to hazardous substances released into the environment by facilities as defined by CERCLA, permitting such claims to accrue upon the discovery of the cause of the injury.[2] Defendants maintain that that CERCLA provision is inapplicable to the instant claims or that it is unconstitutional.

On February 16, 1996, Defendants were granted a period of discovery limited to their statute of limitations defense. On June 11, 1997, Defendants filed a motion for partial summary judgment seeking dismissal of the

---

1. Originally assigned to Hon. John T. Elfvin, this matter was transferred to Hon Richard J. Arcara by order dated October 15, 1995. Judge Arcara, by order dated February 16, 1996, consolidated these actions for all pre-trial purposes. That order was also made applicable to any future related cases. As no discovery regarding the timeliness of the claims in the latest action *Anthony v. Westinghouse*, No. 97–CV–977A(F), had taken place as of the filing of the instant motion, Defendants here seek summary dismissal only as to the motions brought regarding the decedents in the first five actions, specifically (1) *Frier v. Westinghouse*, No. 95–CV–20A(F), which covers the claims pertaining to decedents Mary Jane Farino, Robert L. Farino, Joseph A. Inzinna and Leo N. Phillips were filed, (2) *Batt v. Westinghouse*, No. 95–CV–107A(F), which covers the claims of decedents Charles W. Batt, Rose E. Batt, Stephen C. Grandillo, Henry A. Kuczka, Vincent J. Mongiovi and George Pagel, (3) *Astor v. Westinghouse*, No. 95–CV–247A(F), which covers the claims pertaining to the decedents Lorraine R. Brzezicki, Robert A. Martzolf, Alfred G. Mucha and Mary M. Sturm, (4) *Davies v. Westinghouse*, No. 95–CV–444A(F), which covers the claims of decedents Evo T. Astor and Gretchen A. Heaney, and (5) *Fiels v. Westinghouse*, No. 96–CV–395A(F), which covers the claims of Nelson M. Hirsch, Anthony J. Marino, Isabelle A. Wiedenbeck and Joseph J. Wiedenbeck, Sr. Defendants Memorandum of Law in Support of Consolidated Motion for Partial Summary Judgment (Doc. # 290), filed June 10, 1997, at 2 n. 2 and 3. Each of these complaints has since been amended to correct the names of some defendants but the causes of action asserted by each plaintiff have remained the same.

2. For convenience, the court refers to an action based on an exposure to an alleged hazardous substance as a "toxic tort."

survival and wrongful death actions on behalf of twenty decedents and the consortium claims on behalf of eight surviving spouses as time-barred under the applicable New York statutes of limitations and challenging the applicability and constitutionality of 42 U.S.C. § 9658.[3] Plaintiffs responded on July 11, 1997 and Defendants replied on July 25, 1997. Oral argument was deemed unnecessary.

For the reasons which follow, Defendants' motion for partial summary judgment should be GRANTED in part, and DENIED in part.

### FACTS[4]

The 120 acre Pfohl Brothers Landfill ("the Landfill"), located in the northeastern corner of the town of Cheektowaga, New York, a suburban area adjacent to the City of Buffalo, is listed on the New York State Registry of Active Hazardous Waste Disposal Sites, indicating that the state considers the Landfill to be a public health threat. Many industrial wastes including hazardous substances were deposited into the Landfill between 1932 and 1969. Aero Lake is adjacent to the northwestern corner of the Landfill. Ellicott Creek runs within a few hundred feet of the Landfill and is fed by three tributaries which flow through the Landfill. Ellicott Creek empties into the Niagara River, an international waterway flowing between the United States and Canada.

Plaintiffs in this action have filed claims based on state law negligence, strict liability, gross negligence, loss of consortium, and wrongful death for injuries or deaths to their respective decedents whose deaths they contend were caused by exposure to hazardous and toxic substances in the Landfill. Defendants are the alleged owners and operators of the Landfill; the Third–Party Defendants

assertedly generated and transported the hazardous and toxic substances to the Landfill.[5] According to Plaintiffs, Defendants' negligence is based upon Defendants' failure to take adequate precautionary measures to properly contain and prevent the hazardous substances deposited into the Landfill from escaping and migrating out of the Landfill and its surrounding area where Plaintiffs and their decedents resided. Plaintiffs allege exposure occurred through contact with the ambient air and ground water when their decedents lived, worked or engaged in recreational activity in the vicinity of the Landfill.

Among the toxic substances allegedly deposited in the Landfill are polychlorinated biphenol ("PCB") oils, acetone, trichloroethane, 3–tricloroethane, perchloroethylene, trichloroethylene, tetrachloroephylene, coolant oil, paint treatment, waste cutting oils, degreasing materials, hydraulic oil, waste paint, industrial wastes, fluorinated solvent waste, cobalt, mercury, toluene, vinyl toluene, benzene, xylene, methylene fluoride, lead, lead driers, calcium, cadmium, zinc oxide, curing sulfur, dry metal dust, sand blast grit, foundry wastes, pine tar pitch, pickling solutions, titanium tetrachloride, polyvinyl alcohol film wastes, polyvinyl chloride, naptha, mek, waste inks, heavy metal wastes, paint thinners, paint solvents, industrial solvents, zirconium sludge, phenolic sludges, and paint sludges such as zinc, tin, chrome, iron, nickel, copper, asbestos, phenol, and fly ash.

Defendants who operated manufacturing facilities within the Western New York region and who it is alleged negligently released and disposed of hazardous substances into the Landfill include Westinghouse Electric Corporation during the years 1946 through 1969. General Motors Corporation from the 1950's through 1968, Curtiss–Wright Corporation during the years 1947 through 1966, W.S. Tyler, Incorporated, as

---

**3.** As required by 28 U.S.C. § 2403(a), the court certified on November 6, 1997, to the Attorney General that Defendants have challenged the constitutionality of 42 U.S.C. § 9658, and permitted the Attorney General to intervene on behalf of the United States by filing an application to intervene within twenty days of receipt of such notice. To date, no such application has been filed and the court proceeds on the basis that the United States has waived its right to intervene.

**4.** The fact statement is taken from the complaints, answers, and other papers filed in this action.

**5.** Unless indicated otherwise, references herein to Defendants include the Third–Party Defendants.

successor in interest to Hewitt–Robbins Corp., during the 1950's and 1960's, Laidlaw Waste Systems, Inc., individually, and as successor in interest to U.S. Rubber Reclaiming Co., Inc., during the 1950's and 1960's, Warner Lambert Company, through its subsidiary American Optical, during the 1950's and 1960's, American Standard, Inc., during the 1950's and 1960's. Howden Fan Company, during the 1950's and 1960's, Carborundum Company for the time period 1951 through 1967, E.I. Dupont deNemours, from 1955 through 1968, F.N. Burt Co. from 1959 through 1969, and Litton Industries, Inc., as successor in interest to Hewitt Robbins Corp., during the late 1950's through the 1960's.

Defendants who it is alleged negligently transported and deposited hazardous substances into the Landfill include Waste Management, Inc., through its predecessor, Downing Container Services, from 1952 through the 1960's, Browning–Ferris Industries, Inc., as successor in interests to Joe Ball Sanitation Services, Inc., Rapid Disposal Services, Inc., and Niagara Sanitation Company, Inc., during the 1950's and 1960's, and Dresser Industries, Inc., during the 1950's and 1960's.

The instant motion seeks summary dismissal of the survival actions and wrongful death claims asserted as to twenty decedents, specifically Evo T. Astor, Charles W. Batt, Rose E. Batt, Lorraine R. Brzezicki, Mary Jane Farino, Robert L. Farino, Stephen C. Grandillo, Gretchen A. Heaney, Nelson M. Hirsch, Joseph A. Inzinna, Henry A. Kuczka, Anthony J. Marino, Robert A. Martzolf, Vincent J. Mongiovi, Alfred G. Mucha, George Pagels, Leo N. Phillips, Mary M. Sturm, Isabelle A. Wiedenbeck and Joseph J. Wiedenbeck, Sr.[6] Dismissal of claims for loss of consortium brought in connection with the deaths of Astor, Kuczka, Marino, Martzolf,

Mongiovi, Mucha, Pagels and Phillips is also sought.

### DISCUSSION

Summary judgment of a claim or defense will be granted when the moving party demonstrates that there are no genuine issues as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a) and (b); *Celotex Corp. v. Catrett,* 477 U.S. 317, 331, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Rattner v. Netburn,* 930 F.2d 204, 209 (2d Cir.1991). The moving party for summary judgment bears the burden of establishing the nonexistence of genuine issue of material fact. If there is any evidence in the record based upon any source from which a reasonable inference in the nonmoving party's favor may be drawn, the moving party cannot obtain a summary judgment. *Celotex, supra,* at 331, 106 S.Ct. 2548.

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no issue as to any material fact, and the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson, supra,* at 247–48, 106 S.Ct. 2505.

Defendants have moved for partial summary judgment seeking dismissal of the claims of twenty decedents and eight surviving spouses on statute of limitations grounds, arguing such claims are time-barred because 42 U.S.C. § 9658 does not apply to the asserted causes of action, and, alternatively,

---

**6.** In New York, damages recovered in a survival action are based on pre-death personal injury and become part of the decedent's estate to be distributed in accordance with the decedent's will or by the laws of intestacy N.Y. Est. Powers & Trusts Law § 11–3.3(a) (McKinney 1967). Damages in wrongful death actions are recoverable based on pecuniary losses and do not become part of the decedent's estate, but rather are dis-

tributed directly to those who demonstrate financial dependence on the decedent. N.Y. Est. Powers & Trust Law § 5–4.4(a) (McKinney 1997). In New York, such beneficiaries include those who would be the decedent's distributees pursuant to the rules governing intestate succession, in proportion to the pecuniary damages suffered by each such distributee. N.Y. Est. Powers & Trust Law §§ 5–4.4 and 5–4.5. (McKinney 1991).

that the statute is unconstitutional as it constitutes legislation beyond the scope of congressional power under the Commerce Clause and violates the Tenth Amendment of the United States Constitution. Defendants also seek dismissal under New York law of all survival and wrongful death actions which were commenced without a duly appointed personal representative. Defendants further assert that Plaintiffs' loss of consortium claims must be dismissed as they are derivative of the underlying survival actions on which they are based and therefore are also time-barred. Finally, Defendants argue that the claims for punitive damages must be dismissed as such claims are both legally insufficient and their timeliness is dependent on the underlying time-barred wrongful death, survival actions, and loss of consortium claims.

The court will therefore first determine whether Plaintiffs' claims are time-barred under relevant state law and if so, whether 42 U.S.C. § 9658 is applicable and, to the extent applicable, its preemptive effect on New York law. If the state law is preempted, the court will determine the constitutionality of 42 U.S.C. § 9658. Finally, the court will address whether Defendants' arguments regarding Plaintiffs' failure to have properly appointed representatives requires dismissal and whether Plaintiffs' loss of consortium and punitive damages claims may proceed.

### 1. Statute of Limitations

■ The timeliness of a claim in federal court under diversity jurisdiction, 28 U.S.C. § 1332(a), is governed by the statute of limitations for the state in which the court sits. *Guaranty Trust Co. v. York*, 326 U.S. 99, 109–110, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945); *Personis v. Oiler*, 889 F.2d 424 (2d Cir.1989). Accordingly, the court's analysis begins with an examination of the statutes of limitations

governing the timeliness of survival and wrongful death actions in New York which reveals that, in the instant case, most of Plaintiffs' claims are time-barred under the applicable New York state statutes of limitations.

### a. The Timeliness of Plaintiffs' Claims under New York Law

#### 1. Survival Actions

In New York the traditional limitations period for personal injury torts, including survival actions, based on negligence, strict liability, gross negligence and loss of consortium is three years measured from the date of the injury, defined in toxic tort cases as the date of first exposure to the toxic substance.[7] N.Y.Civ.Prac.L. & R. § 214(5) (McKinney, 1990) (" § 214(5)"). Here, Plaintiffs seek recovery for their decedents' injuries based on exposure to toxic substances that first occurred between the early 1900's, Records of Leo N. Phillips, attached as Exhibit 1 to Affidavit of Laurie Styka Bloom, Esq., in Support of Liaison Group Defendants' Consolidated Motion for Partial Summary Judgment (Doc. # 291) ("Bloom Affidavit"), filed June 10, 1997, and the late 1960's. Records of Henry A. Kuczka, Bloom Affidavit, Exhibit 9. All the instant actions are thus untimely under § 214(5) as more than three years have passed since the date of first exposure to the alleged toxic substances and the filing of the claims by decedents' representatives in 1995 and 1996.

■ In response to complaints that the first exposure rule, judicially established in *Schmidt v. Merchants Despatch Transp. Co.*, 270 N.Y. 287, 200 N.E. 824 (N.Y.1936), barred many plaintiffs from commencing actions for injuries caused by latent effects of exposure to toxic chemicals and other haz-

---

7. When New York's traditional limitations period commenced to run with regard to toxic tort actions has sometimes been misstated. *See, e.g., Kulzer v. Pittsburgh–Corning Corp.*, 942 F.2d 122, 126 (2d Cir.1991) ("at the time, a cause of action for exposure to toxic substances accrued on the last date of exposure to the toxic substances") (applying New York caselaw). However, the New York Court of Appeals recently affirmed that under the traditional New York rule the

limitations period for toxic torts accrued as of the date of first, not last, exposure. *Blanco v. American Telephone & Telegraph Co.*, 90 N.Y.2d 757, 666 N.Y.S.2d 536, 689 N.E.2d 506, 1997 WL 729116. * 3 (N.Y.1997) ("Prior to enactment of CPLR 214–o, this Court has held that, in the case of latent injuries arising out of exposure to toxic substances, the cases of action accrued upon plaintiff's *initial* exposure") (emphasis added).

ardous substances before learning they were injured and the causes thereof, in 1986 the New York legislature enacted § 214–c of New York Civil Practice Law and Rules which created special accrual rules and limitations periods allowing more time for plaintiffs to file claims seeking damages for injuries and deaths attributed to exposure to such substances.[8] Section 214–c(2) provides that a plaintiff who suffers a personal injury in a toxic tort case has three years from the date of the discovery of the injury to commence an action. N.Y.Civ.Prac.L. & R. 214–c (2) (McKinney 1990) (" § 214–c(2)"). Here, Plaintiffs seek recovery based on injuries to their decedents, the earliest of which was discovered in 1961, Records of Evo T. Astor, Bloom Affidavit, Exhibit 6, and the latest of which was discovered in October 1993. Records of Nelson M. Hirsch, Bloom Affidavit, Exhibit 20.[9] An examination of the relevant exhibits submitted on this motion reveals that, the filing of only Nelson M. Hirsch's survival action on June 17, 1996 was timely under § 214–c(2), assuming that Hirsch's discovery of his injury coincided with the diagnosis of Hirsch's cancer in October 1993. *See* Records of Nelson M. Hirsch, Bloom Affidavit, Exhibit 20.

Further, pursuant to N.Y.Civ.Prac.L. & R. § 214–c(4) (McKinney 1990 & Supp. 1997) (" § 214–c(4)"), if the plaintiff discovers the cause of a toxic tort injury within *five* years of the discovery of the injury, the plaintiff may invoke the longer of (a) the *three* year period from the discovery of the injury or (b) a *one* year period from the discovery of the cause within which to commence an action. Here, all Plaintiffs assert that they discovered the cause of their decedents' injuries in 1994 or 1995. Bloom Affidavit, Exhibits 1–20. As less than five years have passed between the asserted dates of

discovery of the decedents' injuries and the discovery of the causes of those injuries only as to the survival actions brought on behalf of the estates of Mary Jane Farino, Nelson M. Hirsch, Isabelle A. Wiedenbeck and Joseph J. Wiedenbeck, Sr., Bloom Affidavit, Exhibits 17, 20, 19 and 16, respectively, only those survival actions meet the first requirement for timeliness under § 214–(c)(4). As stated, with the exception of Hirsch, none of the instant survival actions were filed within three years of the discovery of the fatal injuries. Accordingly, the survival actions are timely only if filed within one year of the discovery of the causes of such injuries.

However, as 1994 is the asserted date of discovery of the cause of the injuries pertaining to the survival actions for Isabelle A. and Joseph J. Wiedenbeck Sr., (Bloom Affidavit, Exhibits 16 and 19), and as those survival actions were not filed until June 17, 1996, Case # 96–CV–395A(F) (Docket No.1), they were not filed within one year of the discovery of the alleged cause of death as required by the statute of limitations period under § 214–c(4), and, as such, are time-barred under New York law, regardless of whether 42 U.S.C. § 9658 applies.[10] The survival action of Mary Jane Farino, filed January 10, 1995 is timely under § 214–c(4), assuming, as Plaintiffs allege, that the cause of Farino's injury was discovered in 1995. Records of Mary Jane Farino, Bloom Affidavit, Exhibit 17. As the asserted date of discovery of the cause of decedent Hirsch's injuries, is "in 1995," depending on the precise date of such discovery, the relevant survival action, filed June 17, 1996, may be timely under § 214–c(4) as well as § 214–c(2). Records of Nelson M. Hirsch, Bloom Affidavit, Exhibit 20. However, even with the benefit of 42 U.S.C. § 9658, the survival action of Nelson M.

**8.** In *Schmidt,* the New York Court of Appeals held that an "injury occurs when there is a wrongful invasion of personal or property rights and then the cause of action accrues. Except in cases of fraud where the statute expressly provides otherwise, the statutory period of limitations begins to run from the time when liability for wrong has arisen even though the injured party may be ignorant of the existence of the wrong or injury." *Schmidt,* at 827.

**9.** It is assumed only for the purposes of this Discussion that the diagnosis of each decedent's injury coincided with the discovery of such injury, a fact which has yet to be established by either party.

**10.** As discussed, *infra, see* Discussion at 523–24, 42 U.S.C. § 9658 does not affect the applicable state limitations period, only the manner of determining the date of accrual of the claim.

Hirsch is untimely under § 214–c(4). *See* Discussion, *infra*, at 531–32.

### 2. *Wrongful Death Claims*

The applicable statute of limitations for wrongful death actions under New York law is two years measured from the date of death. N.Y. Est. Powers & Trusts Law § 5–4.1 (McKinney 1997). Plaintiffs' wrongful death claims pertain to the deaths of persons who died between 1963 and 1993, Bloom Affidavit, Exhibits 1–20, and Plaintiffs concede that all of the instant wrongful death actions, none of which were filed within two years from any of Plaintiffs' respective decedents' deaths, are untimely under N.Y. Est. Powers & Trusts Law § 5–4.1. Plaintiffs' Memorandum of Law, at 1.

### b. *The Purpose of the Federally Required Commencement Date*

As most of the survival actions and all the wrongful death actions are time-barred under New York law, Plaintiffs assert that the timeliness of their survival and wrongful death claims are governed by 42 U.S.C. § 9658, which creates neither a separate federal cause of action based on toxic torts within its terms nor a uniform statute of limitations related to such torts, but rather provides a uniform accrual date from which the applicable state period of limitations governing such tort actions is measured. 42 U.S.C. § 9658A(4)(b). Defendants argue that as 42 U.S.C. § 9658 refers only to actions for personal injury and property damage it is inapplicable to Plaintiffs' otherwise time-barred survival and wrongful death actions. Liaison Group Defendants' Memorandum of Law in Support of Consolidated Motion for Partial Summary Judgment ("Defendants' Memorandum of Law"), filed June 10, 1997, at 21, 25.

Section 9658 of Title 42 of the United States Code is part of the Comprehensive Environmental Response, Compensation and Liability Act, known as "CERCLA." CERC-

LA was enacted in response to the increasing threat to the national environment and public health represented by years of unsafe disposal of hazardous substances. *Meghrig v. KFC Western, Inc.,* 516 U.S. 479, 116 S.Ct. 1251, 1254, 134 L.Ed.2d 121 (1996); *B.F. Goodrich v. Betkoski,* 99 F.3d 505, 514 (2d Cir.1996). As enacted on December 11, 1980, CERCLA contained many provisions to facilitate the expeditious cleanup of hazardous waste sites and to recover the accompanying costs from the responsible parties. *See* 42 U.S.C. §§ 9601, *et. seq.* For example, in addition to permitting actions by federal and state government agencies to remediate the unsafe storage and release of hazardous substances, 42 U.S.C. § 9613(g), CERCLA also authorizes actions by private individuals to accomplish its objectives. 42 U.S.C. § 9607(a)(4)(B) (private individuals may sue for "any other necessary costs of response incurred by any other person consistent with the national contingency plan"); *State of New York v. Shore Realty Corp.,* 759 F.2d 1032, 1041–42 (2d Cir.1985) (CERCLA provides incentive to private parties to take lead role in cleaning up hazardous waste sites).

Congress, however, also had intended that CERCLA provide a legal remedy for private claims based on injuries to persons and property damage attributed to the release of hazardous substances into the environment, although Congress was unable, at the time of CERCLA's enactment in 1980, to agree on the form such legal redress should take. Superfund Section 301(e) Study Group, 97th Cong., 2d Sess., Injuries and Damages from Hazardous Wastes—Analysis and Improvement of Legal Remedies, 16 (Comm. Print 1982) ("Study Group Report"). Accordingly, § 301(e) of CERCLA, 42 U.S.C. § 9651(e), mandated that a study be conducted "to determine the adequacy of existing common law and statutory remedies in providing *legal redress for harm to man* and the environment caused by the release of hazardous substances into the environment." [11] 42

---

11. The term "hazardous substance" is used throughout the CERCLA legislation. 42 U.S.C. § 9601(14). However, the Study Group Report refers to both "hazardous substance" and "hazardous waste" stating "that the definition of 'haz-

ardous waste' *or* 'hazardous substance' can be different for different purposes," and that "[f]or regulatory purposes, depending on the authorizing statute involved, the regulator may have to determine the risk in the light of the counterbal-

U.S.C. § 9651(e)(1) (emphasis added). The study also was to particularly address:

(A) the need for revisions in existing statutory or common law, and

(B) whether such revisions should take the form of Federal statutes or the development of a model code which is recommended for adoption by the States.

42 U.S.C. § 9651(e)(4)(A) and (B).

The results of that study were to be delivered to Congress for consideration in amending CERCLA to deal specifically with these questions. 42 U.S.C. § 9651(e)(4). The Study Group filed its report on July 1, 1982. Study Group Report, at 3.

Congress did not, however, adopt any of the Study Group's ten recommendations, which included an administrative claim procedure upon a federally created fund, and enhancement of the states own statutory remedies to provide for and facilitate the redress of personal injuries and property damage attributed to improper disposal of hazardous substances under 42 U.S.C. § 9651(e)(4)(B). Study Group Report, at 193–271. Instead, Congress responded to the Study Group Report's finding that existing state private tort actions for personal injuries and property damage were effective mechanisms of legal redress, but for the fact that such actions were often time-barred as the relevant state statutes of limitations and related judicial decisions did not permit accrual of an action based on an injury with a long latency period such as cancer to be measured from the discovery of the cause of the injury. Study Group Report, at 21–22, 43. Accordingly, Congress enacted 42 U.S.C. § 9658, providing for a uniform accrual date from which to measure the running of the applicable periods of limitation for state law toxic torts actions.

Specifically, the legislation provides that

(1) In the case of any action brought under State law for personal injury, or property damages, which are caused or contributed to by exposure to any hazardous substance, or pollutant or contaminant, released into the environment from a facility, if the applicable limitations period for such action (as specified in the State statute of limitations or under common law) provides a commencement date which is earlier than the federally required commencement date, such period shall commence at the federally required commencement date in lieu of the date specified in such State statute.... (2) Except as provided in paragraph (1), the statute of limitations established under State law shall apply in all actions brought under State law for personal injury, or property damages, which are caused or contributed to by exposure to any hazardous substance, or pollutant or contaminant, released into the environment from a facility.[12]

42 U.S.C. 9658(a)(1) & (2).

The "federally required commencement date" is defined as

ancing economic benefit resulting from the manufacture and use of the hazardous substance, before and after it becomes hazardous waste." Study Group Report, at 24 (emphasis added). Such language implies that "hazardous waste" is a form of a hazardous substance and, according, use of the term "hazardous substance" in this discussion includes "hazardous waste."

12. A "facility" is defined by 42 U.S.C. § 9601(9) as "(A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel." 42 U.S.C. § 9601(9)(A) and (B). The parties do not dispute that the Landfill comes within this definition. A "release" is defined as "a spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant), but excludes (A) any release which results in exposure to persons solely within a workplace, with respect to a claim which such persons may assert against the employer of such persons, (B) emissions from the engine exhaust of a motor vehicle, rolling stock, aircraft, vessel, or pipeline pumping station, (C) release of source, byproduct, or special nuclear material from a nuclear incident ... and (D) the normal application of fertilizer." 42 U.S.C. § 9601(22). As the instant motion is limited to their statute of limitations defenses, Defendants do not dispute that the al-

the date plaintiff knew (or reasonably should have known) that the personal injury or property damages referred to in subsection (a)(1) were caused or contributed to by the hazardous substances or pollutant or contaminant concerned.

42 U.S.C. § 9658(b)(4)(A) ("the FRCD").

Defendants assert that the FRCD does not apply to the survival and wrongful death actions because they are not "actions for personal injuries" as that term appears in the FRCD. Plaintiffs maintain that both survival and wrongful death actions are within the ambit of the FRCD and that the FRCD preempts the accrual rule of the New York general statute of limitations and its wrongful death statute, which otherwise bar their claims. Plaintiffs' Response to Defendants' Consolidated Motion for Partial Summary Judgment ("Plaintiffs' Memorandum of Law"), filed July 11, 1997, at 1–2.

■ A cause of action "accrues" for statutory limitations periods when "the plaintiff has 'a complete and present cause of action' " *Bay Area Laundry and Dry Cleaning Pension Trust Fund v. Ferbar Corporation of California, Inc.*, 522 U.S. 192, 118 S.Ct. 542, 549, 139 L.Ed.2d 553 (1997). Moreover, "a cause of action does not become 'complete and present' for limitations purposes until the plaintiff can file suit and obtain relief." *Bay Area Laundry and Dry Cleaning Pension Trust Fund, supra* (citing *Reiter v. Cooper*, 507 U.S. 258, 267, 113 S.Ct. 1213, 122 L.Ed.2d 604 (1993) ("While it is theoretically possible for a statute to create a cause of action that accrues at one time for the purpose of calculating when the statute of limitations begins to run, but at another time for the purpose of bringing suit, we will not infer such an odd result in the absence of any such indication in the statute")). Accordingly, as a plaintiff cannot in good faith file suit to obtain relief until causality is known, *see* Fed.R.Civ.P. 11(b) (requiring that all actions and motions in federal court be made with the reasonable belief that such actions are legally warranted and not made for any improper purpose such as to harass or cause undue delay), an action does not accrue, and hence the relevant statute of limitations does not commence to run, absent knowledge, or a good faith belief as to the existence of each element of the tort including causality.

### c. *The FRCD Applies to State Survival and Wrongful Death Actions*

■ Defendants, in their effort to demonstrate that the FRCD does not apply to survival or wrongful death actions, contend that the FRCD was not intended to permit knowledge of the cause of action to accrue to one other than the decedent and that construction of the FRCD to permit such accrual is against public policy.[13]

An essential element of both survival and wrongful death actions is that the decedent have died with a viable cause of action against the defendant for the infliction of the injury which caused the death. N.Y. Est. Powers & Trust Law §§ 11–3.2 (survival actions) and 5–4 (wrongful death actions). Here, the asserted FRCD with respect to the claims of each decedent is well *after* the date of death of each decedent whose claims are subject to the instant motion and who presumably died before it was possible to determine the causes of the decedents' injuries and resulting deaths. Defendants argue that as the FRCD does not expressly provide that a survival or wrongful death action may accrue upon the discovery of the cause of a decedent's fatal injury by one other than decedent, each decedent thus died without a viable cause of action. Defendants' Memorandum of Law, at 27–28. Defendants further assert that permitting a survival or wrongful death action to accrue as of the decedent's estate representative's discovery of the cause of the injury is against public policy as such would create the possibility of an infinite limitations period, thus unfairly burdening Defendants by forcing them to defend stale claims long after the alleged exposures and deaths. Defendants' Memorandum of Law, at 41; Defendants' Reply

leged hazardous wastes at the Landfill have been released into the environment.

**13.** Defendants assert further arguments opposing application of the FRCD to wrongful death ac-

tions. Those arguments are addressed. *Infra,* at 532–35.

Memorandum of Law, at 5–6. The court finds Defendants' arguments are without merit for several reasons.

### 1. *The FRCD Does Not Require That a Decedent Personally Discover the Cause of the Fatal Injury Prior to Death*

Defendants oppose application of the FRCD to both survival and wrongful death actions on the basis that "the key requirement for invoking the FRCD statute (each decedent's *personal* discovery of the cause of his or her injury) is decidedly and admittedly absent in these cases." Defendants' Memorandum of Law at 37–38 (emphasis added). Defendants read the FRCD too narrowly. By its terms, the FRCD is the "date *plaintiff* knew (or reasonably should have known) that the personal injury or property damages referred to in subsection (a)(1) were caused or contributed to by the hazardous substance or pollutant or contaminant concerned." 42 U.S.C. § 9658(b)(4)(A) (emphasis added). The issue therefore is one of statutory interpretation: did Congress mean to include only the physically injured person, *i.e.*, the person to who suffered the physical or bodily harm, in the term "plaintiff" as used in the FRCD, or does the term also include an injured party's legal representative where the injuries result in death before the victim can institute a lawsuit based on his own behalf? For the reasons that follow, the court finds that the latter was Congress' intent.

▇▇▇▇ Where a federal statute is concerned, unless the statute directs otherwise, the terms contained in such federal statute are determined in accordance with federal law. *Urie v. Thompson*, 337 U.S. 163, 174, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949) (holding that definition of "negligence" as used in the Federal Employers' Liability Act, 45 U.S.C. § 51 was to be determined based on federal law). The FRCD is a federal statute and it is axiomatic that "[t]he starting point in every case involving construction of a statute is the language itself." *Landreth Timber Co., v. Landreth*, 471 U.S. 681, 684, 105 S.Ct. 2297, 85 L.Ed.2d 692 (1985) (*quoting Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 756, 95 S.Ct. 1917, 44 L.Ed.2d 539

(1975)). In interpreting a federal statute the court "must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law and to its object and policy." *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 51, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987) (internal citations and quotations omitted) (determining that the legislative intent of ERISA, 29 U.S.C. §§ 1001 *et seq.*, applied to state law claim seeking relief under that federal law). Further, the plain meaning of a statute controls unless "the literal application of the statute will produce a result demonstrably at odds with the intention of its drafters," in which case the legislators' intent rather than the strict language controls. *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982).

A "plaintiff" is commonly defined as "a person who brings an action: the party who complains or sues in a civil action and so named in the record. A person who seeks remedial relief for an injury to rights; it designates a complainant." Black's Law Dictionary, 1150 (6th ed.1990). A "plaintiff" is also defined as "one who commences a personal action or lawsuit to obtain a remedy for an injury to his rights ... the complaining party in any litigation including demandants in real actions, the claimant in equity, and the libelant in divorce." Webster's Third New International Dictionary of the English Language Unabridged 1729 (1986). According to Fed.R.Civ.P. 17(a), "[e]very action shall be presented in the name of the real party in interest. An executor [or] administrator ... may sue in that person's own name without joining the party for whose benefit the action is brought." Fed.R.Civ.P. 17(a). The definition of the real party in interest as the plaintiff and including a representative of an estate has been widely applied in federal courts. *See, e.g., Barrett v. United States*, 689 F.2d 324, 330–32 (2d Cir. 1982) (the estate is a plaintiff for purposes of applying discovery rule to a Federal Tort Claims Act claim); *Estwick v. U.S. Air Shuttle*, 950 F.Supp. 493 (E.D.N.Y.1996) (executor or administrator of estate of decedent permitted to maintain employment discrimination action on behalf of decedent); *Tyx v. Secretary of Health and Human Services,*

1986 WL 2601 *1 (W.D.N.Y.1986) (duly appointed administrator of an estate would be the real party in interest to maintain an action on decedent's behalf).

In *Barrett, supra,* the court permitted the representative of a decedent's estate to bring survival and wrongful death actions on behalf of the decedent who died twenty-two years earlier without ever having obtained personal knowledge of the cause of his fatal injury on the basis that the defendant's concealment of the decedent's true cause of death warranted application of the diligence-discovery accrual standard. The court observed that prior to the defendant's revelation of its actions to the plaintiff representative, the plaintiff had no reason to investigate the possibility that defendant's actions caused her decedent's death, and that decedent himself died without ever having the opportunity to assert his claims. *Barrett,* at 330–31.

Not only does the plain meaning test indicate that the term "plaintiff" includes a legal representative or beneficiary of the physically injured decedent, but the text of the FRCD as a whole indicates Congress carefully chose its phrasing to produce this broader meaning. It is significant that the term "personal injury," as it appears in the FRCD, is not limited in scope to traditional state law legal terminology as Defendants assert. Defendants' Reply Memorandum of Law, at 2–4. As there is no modifier to the term indicating an intention to exclude a third person, the object of the noun "plaintiff" in the FRCD is simply "the" personal injury or property damage without any additional modifications or restrictions. 42 U.S.C. § 9658(b)(4)(A). Adoption of a narrow construction of the term "plaintiff," limited to the person suffering the physical effects of the exposure as urged by Defendants, would preclude the representative of a decedent's estate from being substituted as the plaintiff where the decedent initiates the toxic tort action during his life, yet dies while the action was pending. Defendants provide no reason to find that Congress intended such a result.

With the discovery rule of the FRCD, the requirement that the decedent have a viable cause of action at death is satisfied although the decedent lacked personal knowledge that he had been injured. The existence of each element of the allegedly tortious conduct occurs at or prior to death regardless of whether the decedent died without knowing he was the victim of the tortious conduct. The question of accrual for purposes of the relevant statute of limitations thus depends on what either the decedent or the representative knew, not solely on what happened to the decedent. Given Congress' intention in enacting legislation which sought to remedy what it viewed as the out-moded and arbitrary first (or last) exposure rule of accrual and the variants created by the majority of states as a substitute accrual test in toxic tort actions covered by CERCLA, the broader construction of the term "plaintiff" to include a deceased victim's representatives in survival and wrongful death actions within the FRCD is more consistent with Congress' objective in enacting the FRCD to address the "harm to man" caused by exposure to hazardous substances and wastes by expanding the opportunity for legal redress in the courts. 42 U.S.C. § 9651; Study Group Report at 16.

Although, as discussed, state law is not controlling on this issue. Defendants' contention that the awareness of the injury and cause as a prerequisite to a survival action must be acquired by the decedent to accrue an action is also contrary to New York law. For example, in *Rothstein v. Tennessee Gas Pipeline Co.,* 204 A.D.2d 39, 616 N.Y.S.2d 902 (App.Div.2d Dep't.1994), *aff'd,* 87 N.Y.2d 90, 637 N.Y.S.2d 674, 661 N.E.2d 146 (N.Y. 1995), the fact that the decedent never personally obtained knowledge of the cause of the injury or even the fact of the injury itself, which was first discovered in exploratory surgery during which decedent died, did not prevent the decedent's widow, as the representative of his estate from filing valid survival and wrongful death actions on behalf of decedent's estate and herself, *Rothstein, supra,* 204 A.D.2d 39, 616 N.Y.S.2d 902. Thus, even New York's survival or wrongful death action statutes do not require that a decedent die possessed of personal knowledge of the cause of his fatal injury, nor bar commencement of such action where knowledge of the cause accrued only to the representative and

beneficiaries of the decedent's estate after death. *See, e.g., Annunziato, v. City of New York,* 224 A.D.2d 31, 647 N.Y.S.2d 850 (App. Div.2d Dep't.1996) (implying that where decedents died in 1988 and 1990 without ever personally knowing the cause of their injuries, and representatives of decedents' estates discovered such causes in 1992, survival action filed in 1993 based on knowledge of representatives may be timely under N.Y.Civ.Prac.L. & R. § 214–c(4)); *Greene v. Abbott Laboratories,* 148 A.D.2d 403, 539 N.Y.S.2d 351 (App.Div.1st Dep't.1989) (recognizing that action may accrue for purposes of § 214–c upon discovery of cause of injury by one other than decedent). Accordingly, the fact that the decedent did not personally discover the cause of his fatal injury prior to death does not preclude maintenance of a survival or wrongful death action by the representative of a decedent's estate.

### 2. *Public Policy Supports Application of the FRCD to Survival and Wrongful Death Actions*

Defendants maintain that to avoid the creation of an open-ended statute of limitations for toxic torts, public policy argues against a construction of the FRCD that modifies the applicable New York statute of limitations by measuring its accrual date from the discovery of the decedent's cause of injury by someone other than the decedent. Defendants' Memorandum of Law, at 41; Liaison Group Defendants' Reply Memorandum of Law in Support of Consolidated Motion for Partial Summary Judgment ("Defendants' Reply Memorandum of Law"), at 5. In Defendants view, potential defendants in toxic tort cases would be unfairly burdened with defending old claims in situations where the information establishing injury and cause may be handed from one legal representative who may resign, to a new representative, Defendants' Memorandum of Law, at 41, or by collusion of a decedent's descendants to manipulate the running of the statute of limitations by selecting as an estate representative one who had only recently discovered the cause of an injury, despite the earlier knowledge of such cause by other heirs. Defendants' Reply Memorandum of Law, at 6. Defendants also complain that none of the

Plaintiffs suing in a representative capacity can know or prove that their decedents had not discovered the cause of their injuries prior to their respective deaths, triggering the limitations period under § 214–c(4). Defendants' Reply Memorandum of Law, at 6.

Such arguments cannot be sustained under careful scrutiny because they overlook the fact that the FRCD is defined as "the date plaintiff knew (or reasonably should have known)" the cause of the personal injuries. 42 U.S.C. § 9658(b)(4)(A). Such factual knowledge will therefore be attributed to either the decedent or his representative. In New York, for example, if the information was reasonably available for either the decedent or for one prospective estate representative to discover the cause of the decedent's injury, the applicable limitations statutes are read as imputing such information to all prospective estate representatives, who are then presumed to have constructive knowledge of the facts upon which such cause is based. *See Matter of New York County DES Litigation,* 89 N.Y.2d 506, 655 N.Y.S.2d 862, 678 N.E.2d 474 (N.Y.1997) (finding that as nothing in the history of § 214–c suggests that the New York Legislature intended to make the running of the applicable statute of limitations dependent on a plaintiff's subjective knowledge of the cause of his condition and that knowledge of the cause of a toxic tort injury may be imputed to a plaintiff once the technical knowledge of the scientific and medical communities exists to establish the cause of such injury); *Annunziato, supra.* Thus, once any legal representative, *i.e.,* a plaintiff, is cast with the discovery contemplated by the FRCD, such fact cannot be escaped by any succeeding representative. Defendants' opposition also fails to address the practical fact that such a representative acting as a plaintiff has no interest in delaying suit as such delay would only serve to increase the burdens of establishing already difficult issues of causality.

An additional answer to Defendants' fear of endless exposure to suit under the FRCD is that the FRCD does not displace a state's prerequisites to suit. For example, in New York once sufficient information is available to establish the FRCD for a claim, failure to

name the personal representative of an estate will not prevent the running of the statute for such claim. *See Baez v. New York City Health and Hospitals Corp.*, 80 N.Y.2d 571, 592 N.Y.S.2d 640, 607 N.E.2d 787, 788 (N.Y.1992) (holding statute of limitations not tolled based on infancy where will designated plaintiff as executor of estate and such plaintiff could have timely sought appointment as personal representative of decedent's estate to commence action on infant's behalf.). Such a tolling of the FRCD would result in an overly generous accrual mechanism not found elsewhere within New York law and the FRCD by its terms does not displace such prerequisites. This finding comports with general state rules providing that where an injured party dies knowing the cause of his injury, but before the applicable statute of limitations had expired, the survival action may be commenced if a representative of the estate is timely appointed and the action timely commenced, *i.e.*, within the three year limitations period under § 214–c(2). Revival was not recognized at common law, *Seeley v. Dallao Restaurant*, 238 A.D.2d 497, 656 N.Y.S.2d 679 (App.Div.2d Dep't.1997) (holding that personal injury action sounding in common law negligence should not have been reinstated under revival provision of a statute, N.Y.Gen.Mun.Law § 205–e(2) (McKinney 1997)). The court finds no indication in the language or context of the FRCD supporting an interpretation that where a decedent dies possessed of the knowledge contemplated by the FRCD, Congress intended to revive a toxic tort claim that was extinguished by death without timely appointment of a representative within the applicable period of limitations to timely file such claim. The FRCD expresses no intent to revive such claims where such a failure to comply with state law occurred. *Compare* New York one year window for filing time-barred claims under revival laws involving specified toxins or hazardous devices: 1986 N.Y.Laws ch. 682, §§ 4, 12 (diethylstilbrestrol, tungsten-carbide, asbestos, chlordane and polyvinylchloride);[14] 1993 N.Y.Laws ch. 419, § 1 (silicone breast implants and Dalkon shields).

Defendants also argue that permitting a decedent's representative to use the discovery accrual rule in a toxic tort case and bring survival or wrongful death claims could create an "absurd result" whereby a distant descendant, upon discovery of the causes of his ancestor's injury, could timely commence suit generations after the death of the decedent. Defendants' Reply Memorandum of Law, at 5–6. But the passing of significant time between death and the commencement of an action is not, in itself, absurd. In fact, several courts have applied the discovery rule in toxic tort cases, permitting survival actions and wrongful death cases to be maintained by the representative of an estate where the decedent never learned of the cause of the fatal injury. *Barrett, supra; Rothstein, supra; White v. Johns–Mansville Corp.*, 103 Wash.2d 344, 693 P.2d 687 (Wash. 1985) (survival and wrongful death actions); *See, generally*, Judy E. Zelin, J.D., Annotation, *Time of Discovery as Affecting Running of Statute of Limitations in Wrongful Death Action*, 49 A.L.R.4th 972, §§ 4, 5 and 8 (1986) (wrongful death actions). As discussed, using New York law as an example, despite potentially long periods of time passing since exposure to a toxic substance, an action including a survival action may still be timely commenced provided it is filed within three years of the discovery of the resulting injury. § 214–c(2).

As to wrongful death actions, in New York such actions may be maintained only by a distributee of decedent, defined as one who is entitled to intestate rights in a decedent's estate, N.Y.Est. Powers & Trusts Law § 1–2.5 (McKinney 1981). Contrary to Defendants' fear of unending liability if the FRCD is applied to wrongful death actions, it has

14. The court notes that polyvinylchloride was asserted as a toxic substance deposited into the Landfill by E.I. Dupont deNemours in the action commenced by the complaint filed in 96–CV–395E(F). However, as that complaint was filed beyond the one year window, the revival law does not affect the claims contained therein. The court has further determined that three of the four decedents on whose behalf actions were filed in that case, specifically, Anthony J. Marino, and Isabelle A. and Joseph J. Wiedenbeck are time-barred, *see* Discussion, *infra*, at 532, and the timeliness of such claim pertaining to the fourth decedent, Nelson M. Hirsch, does not depend on the revival law.

long been the law in New York that the death of such distributee results in abatement of a wrongful death action where no action was commenced by the decedent's distributee during life, and such deceased plaintiff is not survived by another distributee of the first decedent. *See Hernandez v. New York City Health and Hospitals Corp.*, 78 N.Y.2d 687, 578 N.Y.S.2d 510, 585 N.E.2d 822, 825 (N.Y.1991) (citing *Meekin v. Brooklyn Heights R. Co.*, 164 N.Y. 145, 58 N.E. 50 (N.Y.1900) (wrongful death action brought by father as distributee of deceased daughter would have abated upon death of father absent existence of other distributees of daughter)). Thus, the potential toxic tort action cannot continue beyond the lifetime of a decedent's distributees alive at the decedent's death.

Refusing to recognize the FRCD's effect in preserving the right of a representative or beneficiary of a decedent's estate to pursue a survival or wrongful death action based on a toxic exposure also creates an anomaly when compared to the fact that under CERCLA a former owner of real property may be held liable for the costs of removal and cleanup of hazardous substances deposited onto that property while the owner was in fee regardless of how much time has elapsed and that the property may have since been sold or transferred. 42 U.S.C. 9607(a). Moreover, accepting Defendants' argument that the FRCD does not pertain to survival and wrongful death actions results in an incongruity where a hazardous substance causes property damage claims which, in New York, survive a decedent's death and may be brought by the representative of the decedent's estate. N.Y.Est. Power & Trust Law § 11–3.2(b) (McKinney 1997). Additionally, such action accrues under the FRCD upon the discovery that real property has been contaminated by hazardous substances or waste, despite the lapse of time since such substance or waste was released into the environment and the lack of knowledge of the potential claim by the decedent owner. As the FRCD applies to the property damage claim, the discovery of the cause of the

damage by the representative of the estate would accrue the action for statute of limitations purposes. Acceptance of Defendants' exclusion of survival and wrongful death actions from the FRCD results in more beneficial treatment of property damage claims than for toxic torts involving people.

The court thus finds that no public policy considerations would be impaired by a construction of the FRCD under which survival and wrongful death actions may be maintained where knowledge of the cause of the decedent's injuries accrues to the representative of the estate after decedent's death. Nor does such finding create, as posited by Defendants, an open-ended statute of limitations for potential toxic tort defendants in cases where toxic tort victims have died. Most significantly, as discussed, the plain meaning of Congress' use of the term plaintiff between the FRCD and its context supports this interpretation and avoids any inconsistency in the treatment of property damage claims and harm to human beings in such cases.

In the case at bar, all the instant claims, with the possible exception of the survival action of Mary Jane Farino and the survival and wrongful death actions on behalf of Nelson M. Hirsch, are barred under New York law.[15] Accordingly, it is necessary to examine the effect of the FRCD on the viability of the instant survival and wrongful death claims other than for these Plaintiffs.

### d. The FRCD's Effect on Plaintiffs' Survival Actions under New York Law

A survival action is an action for injury to a decedent's person or property which survives and may be maintained by the representative of decedent's estate, on behalf of the decedent. N.Y.Est. Powers & Trust Law §§ 11–3.1 and 11–3.2(b) (McKinney 1997); *Ratka v. St. Francis Hospital*, 44 N.Y.2d 604, 407 N.Y.S.2d 458, 378 N.E.2d 1027, 1030 (N.Y.1978). Any damages recovered in such action belong to the decedent's estate and are distributed in accordance with decedent's

---

**15.** The court notes that although Defendants were given the opportunity, Defendants have not presented any factual basis in connection with

this motion to establish the correct FRCD with regard to the claims pertaining to these decedents.

will or the laws of intestacy. N.Y.Est. Powers & Trust Law § 11–3.3 (McKinney 1967).

It remains the law that personal injury actions in New York are subject to a three year period of limitations measured from the date of the infliction of the injury. N.Y.Civ. Prac.L. & R. § 214(5) (McKinney 1990). In the case of toxic torts, the date of first exposure to the hazardous substance would be the infliction of the injury under § 214(5). *Schmidt, supra.* However, under the discovery rule, § 214–c(2), enacted in 1986, a three year statute of limitations applies to actions in which recovery is sought "for personal injury or injury to property caused by the latent effects of exposure to any substance or combination of substances," measured from the date of the *discovery of the injury or damage.* N.Y.Civ.Prac.L. & R. § 214–c(2) (McKinney 1990). Additionally, where the prospective plaintiff discovers his injury but is unaware of the cause until more than three years after discovery of such injury, thus rendering the action untimely under § 214–c(2), an action may still be timely if commenced within the one year limitations period under § 214–c(4), measured from the *discovery of the cause of the injury or damage* provided that the plaintiff establishes "that the state of medical or scientific knowledge was such that causation of his injury could not have been identified within the three-year period prescribed [under § 214–c(2) ]." Practice Commentary to N.Y.Civ.Prac.L. & R. § 214–c(4), p. 634–35 (McKinney 1990).

A transitional rule, N.Y.Civ.Prac.L. & R. § 214–c(6) (McKinney 1990) (" § 214–c(6)"), further provides that the new toxic tort accrual and limitations rules

shall be applicable to acts, omissions or failures occurring prior to, on or after July first, nineteen hundred eighty-six, except that this section shall not be applicable to any act, omission or failure:

(a) which occurred prior to July first, nineteen hundred eighty-six, and

(b) which caused or contributed to an injury that either was discovered or through the exercise of reasonable diligence should

have been discovered prior to such date, and

(c) an action for which was or would have been barred because the applicable period of limitations had expired prior to such date.

N.Y.Civ.Prac.L. & R. § 214–c(6).

A clear reading of § 214–c(6) indicates that toxic tort actions which meet all three enumerated criteria thereunder, are not given the benefit of the longer toxic tort limitations periods as provided for by §§ 214–c(2) and (4). The FRCD, however, is retroactively applicable to *actions brought after December 11, 1980,* the date of CERCLA's enactment.[16] CERCLA, Title II, § 203(b), 100 Stat. 1696. The FRCD thus preserved any claims for which the cause of the injury had yet to be discovered as of December 11, 1980. *See Kowalski v. Goodyear Tire and Rubber Co.,* 841 F.Supp. 104, 108 (W.D.N.Y.1994) (holding toxic tort action filed in 1992 timely under § 214–c given the preemptive effect of the FRCD where exposure occurred over twenty-five year period, cancer was diagnosed in 1984, but the cause was not determined until 1990). As the instant claims were all commenced in either 1995 or 1996, assuming the cause of such injuries was discovered, as asserted, in 1994 or 1995, the claims would not have been barred under the FRCD. Thus, the claims do not fall within the third criteria under § 214–c(6), and thereby gain the benefit of the longer accrual rules based on discovery, available under § 214–c.

Where federal law preempts state law it does so only to the extent that the state law is inconsistent with the federal law. *See Aetna Life Insurance Co. v. Borges,* 869 F.2d 142, 148 n. 8 (2d Cir.), *cert. denied,* 493 U.S. 811, 110 S.Ct. 57, 107 L.Ed.2d 25 (1989) (refusing to apply federal ERISA where state law was not inconsistent with federal law). By its terms, the FRCD specifically preempts state law only insofar as "the applicable limitations period for such action (as specified in the State statute of limitations or

---

16. CERCLA applies to pre–1980 release of toxic substances and such retroactive application has been recently upheld. *United States v. Olin Cor-*poration, *107 F.3d 1506, 1513–14 (11th Cir. 1997). Defendants do not raise this issue as a defense.

under Common law) provides a commencement date which is earlier than the federally required commencement date." 42 U.S.C. § 9658(a).

█ Generally, there is no need for the FRCD's preemptive effect to save claims time-barred under § 214–c(2) as the New York Legislature has provided that in the normal course of toxic tort litigation, if the otherwise applicable period of limitations has run under § 214–c(2), a plaintiff's sole recourse would be to invoke the "discovery of the cause of the injury" accrual rule, § 214–c(4), by demonstrating that it was not possible to determine the cause of his injury within the limitations period for § 214–c(2), the "discovery of the injury rule." § 214–c(4); *Matter of New York County DES Litigation,* 89 N.Y.2d 506, 655 N.Y.S.2d 862, 678 N.E.2d 474, 477 (N.Y.1997). Defendants assert that the FRCD is inapplicable to personal injury claims in New York because § 214–c(4) and the FRCD provide for identical accrual dates, and thus, in Defendants' view, preemption is unnecessary. Defendants' Memorandum of Law, at 25

Although under both the FRCD and § 214–c(4), the time in which to commence an action is measured from the date the plaintiff knew or should have known the cause of his injury, the FRCD and § 214–c(4) are nevertheless inconsistent to the extent that § 214–c(4) permits the action only where the cause of the injury is discovered within the five years of the discovery of the injury. *See* N.Y.Civ.Prac.L. & R. § 214–c(4). Thus, because the availability of the one year limitations period under § 214–c(4) is limited to situations where the cause of the injuries is discovered within five years of the discovery of the injury, § 214–c(4) provides for an earlier accrual date than permitted by the FRCD under which the accrual of the potential claim is temporally unrestricted. *Compare* 42 U.S.C. 9658(b)(4)(A), *supra*, at 12.

Accordingly, to render § 214–c(4) consistent with federal law, the FRCD's preemptive effect applies to § 214–c(4) to nullify only the maximum five year period within which the statute of limitations under § 214–c(4) applies in a case within the FRCD's terms. As the FRCD does not affect the actual limitations periods established by state law, the one year period provided by § 214–c(4) will attach to the claim upon discovery of the cause of the injury, as the FRCD permits, regardless of how much time has elapsed since the discovery of the injury. Therefore, the FRCD's preemptive effect does not displace the one year period established by § 214–c(4).

█ However, Plaintiffs' assertion that they discovered the causes of their respective decedents' injuries in 1994 or 1995 is significant. Bloom Affidavit, Exhibits 1–20. In opposing Defendants' motions with regard to the earlier motions to compel discovery, it was asserted by Plaintiffs that the FRCD was December 19, 1994, on which the preliminary findings of the environmental consultants' reports and studies commissioned by a local law firm were shared with Plaintiffs at a meeting with a member of the firm. Plaintiffs' Responding Affidavit to Defendants' Motion to Compel Discovery (Doc. # 134), filed June 7, 1996, at p. 8, ¶ 19. Thus, the information was available on December 19, 1994 for all Plaintiffs to learn the cause of their decedents' injuries. *See* Discussion, *supra*, at 24–27. Accordingly, December 19, 1994 is the latest possible FRCD for any of these claims whose timeliness depends on the FRCD because they are otherwise time-barred under New York law.

Defendants further argue that even if the court finds that the FRCD preempts the specific accrual rules established by § 214–c, as § 214–c applies only to those acts which occurred on or after July 1, 1986, Defendants' Memorandum of Law, at 15–16, no Plaintiff for whom the injury was discovered prior to July 1, 1986, and for which injury more than three years had elapsed between the date of exposure and July 1, 1986, can invoke any part of § 214–c, and thus the FRCD, to demonstrate the required timeliness of such claim. Defendants' Memorandum of Law, at 15–16. Defendants' argument is based on N.Y.Civ.Prac.L. & R. § 214–c(6) which restricts the applicability of the new limitations period under § 214–c. *See Discussion, supra,* at 530. However, as noted, the FRCD preserves all claims brought in a state court after December 11,

1980. Accordingly, the instant claims were not time-barred under § 214–c(6)(c),[17] and, as such, receive the benefit of the more favorable statute of limitations under § 214–c, as preempted by the FRCD.[18]

Summary judgment should therefore be GRANTED as to the survival actions filed later than December 19, 1995, i.e., after the one year limitations period available under § 214–c(4) had run from the asserted FRCD of December 19, 1994, specifically, the survival actions of Anthony J. Marino, Joseph J. Wiedenbeck, and Isabelle A. Wiedenbeck. As discussed, depending on the determination of the respective FRCD, the survival action of Nelson M. Hirsch may be timely under New York law even without application of the FRCD. Further, the timeliness of the remaining survival actions cannot be determined until the correct FRCD, the date Plaintiffs discovered or should have discovered the cause of decedents' injuries, is established, an issue not presented to the court on this motion. Summary judgment should therefore, be DENIED as to the survival actions of Evo T. Astor, Charles W. Batt, Rose E. Batt, Lorraine R. Brzezicki, Mary Jane Farino, Robert L. Farino, Stephen C. Grandillo, Gretchen A. Heaney, Nelson M. Hirsch, Joseph A. Inzinna, Henry A. Kuczka, Robert A. Martzolf, Vincent J. Mongiovi, Alfred G. Mucha, George Pagels, Leo N. Phillips and Mary M. Sturm.[19]

e. *The FRCD's Effect on Plaintiffs' Wrongful Death Actions under New York Law*

Whereas a survival action is an action for personal injuries which survives and is brought on behalf of a decedent with any damages recovered becoming part of the decedent's estate and are distributed according to the decedent's will or the laws of intestacy, a wrongful death action may only be asserted by the distributees of an estate to recover the pecuniary loss suffered by such distributees as a result of decedent's death. *See, e.g.,* N.Y.Est. Powers & Trusts Law § 5–4.1, 5–4.3 and 5–4.4; *Ratka, supra,* at 1030. In the instant case, the court concludes that the plain meaning of the FRCD, the broad remedial purpose and the public policy of CERCLA support holding that the FRCD applies to wrongful death actions as well as survival actions.

■ Defendants maintain that the FRCD's reference to "any action brought under State law for personal injury," 42 U.S.C. § 9658, requires that the term "personal injury" be defined according to state law under which it is provided that wrongful death actions are not actions for personal injury actions. Defendants' Reply Memorandum of Law, at 2, 3–5. Defendants offer no support for this position, but instead rely on a New York statute, Gen. Const. Law § 37–a (McKinney 1951) which states " '[p]ersonal injury' includes libel, slander and malicious prosecution; also an assault, battery, false imprisonment, or other actionable injury to the person either of the plaintiff, or of another". Under New York law, this definition of personal injury covers "every variety of injury to a person's body, feelings, or reputation." *Barracca v. St. Francis Hospital,* 166 Misc.2d 726, 634 N.Y.S.2d 941, 942 (Sup.Ct. Queens County 1995), *citing Bonilla v. Reeves,* 49 Misc.2d 273, 267 N.Y.S.2d 374 (Sup.Ct.N.Y. County 1966). In *Annunziato*

---

**17.** The FRCD by its terms preempts the capacity of § 214–c(6) to disallow a claim where more than three years have run from the time a plaintiff knew or should have discovered the injury prior to 1986 as § 214–c(6) does not apply where the cause of the injury is discovered after the FRCD's effective date of December 11, 1980.

**18.** The fact that the FRCD allows some toxic tort claims to be pursued if filed after December 11, 1980 does not imply that all such claims based on pre–1980 exposures remain viable. Thus, any toxic tort claims which may have been litigated and judicially determined to be time-barred could not be relitigated under the FRCD as such claims would necessarily have been based on the

plaintiffs' awareness of both the asserted injury and its cause. These claims would by definition be excluded from the FRCD.

**19.** It appears to the court that Defendants presently proceed on the assumption that the latest possible date of discovery of the cause of the decedents' injuries is December 19, 1994 as Plaintiffs alleged in their papers filed with regard to the Defendants' earlier discovery motion. As these actions were commenced within one year of that date, they must, unless an earlier discovery date can be established, be considered timely within the one year period required under § 214–c(4).

*v. City of New York,* 224 A.D.2d 31, 647 N.Y.S.2d 850 (App.Div.2d Dep't.1996), the court declined to extend application of the discovery rule under N.Y.Civ.Prac.L. & R. § 214–c to wrongful death actions on the basis that § 214–c is "by its express language limited to causes of action to recover damages for personal injury and injury to property." *Annunziato, supra,* at 854; *accord, Matter of Estate of Kritzer,* 146 Misc.2d 1050, 553 N.Y.S.2d 968, 970 (Surr.Ct. New York County 1990), and *In re Fahys,* 18 F.Supp. 529 (S.D.N.Y.1937). Therefore, if New York law controlled, the term "personal injury" as used in the FRCD could be held to exclude wrongful death actions.

On the other hand, Plaintiffs assert that their wrongful death actions seek recovery of damages for the injuries personally sustained by each Plaintiff in the form of lost future income and services as a direct consequence of the decedents' personal injuries which led to their deaths. Plaintiffs Memorandum of Law in Opposition to Partial Summary Judgment, at 6. Plaintiffs' arguments are grounded in public policy and congressional intent, factors which may only be considered where the plain meaning of the terms of a statute are ambiguous or unclear. *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1313 (2d Cir.1995) ("the plain meaning of a statute is normally controlling except in the rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters") (internal quotations omitted). Plaintiffs therefore maintain that the FRCD should preempt the accrual date of the statute of limitations for wrongful death actions because (1) the pecuniary losses incurred by plaintiffs are personal to each plaintiff therefore constituting a personal injury within the meaning of that term as used by the FRCD, (2) wrongful death actions are derivative of personal injury actions, and (3) the remedial purposes of CERCLA and the FRCD support such an application. Plaintiffs Memorandum of Law, at 4–9.

### 1. *Wrongful Death Actions are Actions for Personal Injury Within the Plain Meaning of the FRCD*

The fact that the FRCD applies to an action brought under state law does not re-quire that the definition of a critical undefined term in that statute be defined by that state's law. Moreover, where a federal statute is concerned, unless the statute directs otherwise, the definitions of terms as they appear within such federal statute are determined in accordance with federal law. *See* Discussion, *supra,* at 525. The FRCD itself does not contain any suggestion that the general rule that federal law controls the interpretation of a term used in a federal statute does not apply to it.

Here, the plain meaning of the term "personal injury" within the context of the FRCD indicates it encompasses a wrongful death actions as "an action . . . for personal injury." 42 U.S.C. § 9658(a)(1). "Injury" is commonly defined as "a violation of another's rights for which the law allows an action to recover damages or specific property or both: an actionable wrong." Webster's Third New International Dictionary of the English Language Unabridged 1164 (1986). "Personal injury" is defined as "an injury affecting one's physical and mental person as contrasted with one causing damage to one's property [or] an injury giving rise to a personal action at law." *Id.* at 1686. This definition of "personal injury" thus distinguishes between injury to one's person as compared to injury to one's property. In Black's Law Dictionary, "personal injury" is defined as "a hurt or damage done to a man's *person,* such as a cut or bruise, a broken limb, or the like, as distinguished from an injury to his property or his reputation, [although] the term [personal injury] is also used (usually in statutes) in a much wider sense, and as including any injury which is an invasion of personal rights." Black's Law Dictionary, 786 (6th ed. 1990) (Italics in original).

A wrongful death action brought to recover pecuniary damages attributed to the wrongful taking of a life is a remedy for the violation of the decedent's dependents' right to financial support lost to them as a result of their decedent's death. As wrongful death actions arise from injury to one's person rather than to one's property, they are within the plain meaning of the term "personal inju-

ry." Whether an action seeking damages for personal injuries should receive the benefit of the preemptive force of the FRCD is directly related to the purposes of the FRCD, "to provide legal redress for harm to man" through uniform access to state courts for toxic tort victims. *See* Study Group Report, at 28–30. That the FRCD itself applies to recovery for personal injury and property damage demonstrates that "harm to man" was understood by Congress as referring to not only physical or bodily injury to persons, but also to economic loss caused by exposure to hazardous substance or waste. Had Congress provided that the action subject to the FRCD was limited to physical or bodily injuries, such would more persuasively support the Defendants' theory that the FRCD excludes wrongful death actions which are typically directed at recovery of economic loss rather than for physical harm to the victim-decedent. To permit such restricted scope to be determined by exclusive reference to state law, as Defendants urge, would risk destroying the national uniformity Congress sought to achieve by enacting the FRCD.[20]

In further support of their position that "personal injuries" should not be construed as including "wrongful death actions," Defendants point to one sentence in the Study Group Report which states "[i]n states that have not clearly adopted the discovery rule (*i.e.*, that the cause of action accrues from the time the plaintiff discovered or reasonably should have discovered the injury or disease) the cause of action will usually be time-barred when the plaintiff discovers *his hurt*." Study Group Report, at 240–41 (emphasis added); Defendants' Memorandum of Law, at 22. Defendants' argument that the quoted reference to "his hurt" signals that the Study Group itself did not consider altering state toxic tort rules except as to the injured victim only, must be rejected for several reasons. First, as noted, Congress adopted

none of the ten alternative recommendations proposed by the Study Group which was established to assist Congress in achieving the objectives of CERCLA § 301. Instead, Congress enacted the FRCD, a concept not ever discussed by the Study Group Report, to rectify the problem of the harm inflicted on humans by releases of hazardous substances which the Study Group had been directed to address. The fact that the FRCD was not among the Study Group's recommendations indicates that Congress found the Study Group Report's recommendations inadequate for meeting the stated purpose of § 301. The Study Group Report therefore is of limited assistance in gauging the meaning of key terms as used in the FRCD.

Second, although it can be argued that the phrase "his hurt" was intended to refer only to the bodily or physical injury suffered by the victim exposed to the toxic substance, that argument is undercut by the references elsewhere in the text of the Study Group Report to the discovery of "the injury or disease." *See, e.g.,* Study Group Report, at 240 ("Since many of the hazardous wastes are carcinogens, mutagens, teratogens, or substances with delayed impact on different organs or the central nervous system, the latency period for the appearance of injury or disease is likely to be extended for thirty years or more"). Drawing a distinction between "injury" and "disease" without any reference to "property damage" indicates that the terms "injury" and "hurt" as used by the Study Group Report are to be broadly construed as including more than simply a physical or bodily harm to the victim exposed to the toxic substance. The FRCD's reference to "the plaintiff" without a possessive modifier further supports this finding.

Third, the Study Group Report did not need to specifically refer to survival and

20. The term "personal injury" has also been held to include wrongful death actions in connection with other federal legislation. For example, the term "personal injury" as used in federal tax law has been construed as encompassing wrongful death actions. Specifically, "gross income" under Internal Revenue Code § 104(a)(2) does not include "the amount of any damages received . . . on account of personal injuries." I.R.C. 104(a)(2) (1997). According to the Internal Revenue Service, damages recovered in wrongful

death actions are excluded from gross income pursuant to I.R.C. § 104(a)(2). Rev.Rul. 54–19, 1954–1 C.B. 179. The Supreme Court, pursuant to Rev.Rul. 54–19, has held wrongful death awards are damages received on account of personal injuries. *Norfolk and Western R. Co. v. Liepelt,* 444 U.S. 490, 496, 100 S.Ct. 755, 62 L.Ed.2d 689 (1980). "The discovery rule has also been applied to survival and wrongful death actions under the Federal Tort Claims Act." *See Barrett, supra.*

wrongful death actions in discussing potential remedies for personal injuries or hurt. Except where, depending upon the particular statutory scheme, special statutes of limitation rules apply, the term personal injury both as used by lawyers and non-lawyers is commonly understood and even advertised as encompassing survival and wrongful death actions.[21] This is so because it is horn-book law that survival and wrongful death actions derive from a decedent's injuries suffered while still alive. *See* Discussion, *supra,* at 524.

Fourth, there are indications in the Study Group Report that the Study Group was aware that the problem of providing for remedies for losses to individual persons caused by toxic exposures resulting in death needed to be addressed by Congress. For example, in its discussion of existing federal statutes providing personal injury remedies, the Study Group Report cites nine such statutes, including the Black Lung Act of 1981, the Federal Employers Liability Act, the Jones Act and the Federal Tort Claims Act, each of which provides for remedies in cases of death. It may be fairly inferred from this discussion of such available remedies that the Study Group was well aware that toxic exposures frequently result in the death of the exposed person and that any remedial measure adopted by Congress to deal with the issue of providing legal redress for injuries to man resulting from such exposures would necessarily include survival and wrongful death actions.

## 2. *The FRCD's Legislative History FRCD Indicates Congress Intended Actions for Personal Injury to Include Wrongful Death Actions Within the Context of the FRCD*

Finally, finding that "personal injury," as that term appears in the FRCD, includes wrongful death actions comports and does not produce a result that is demonstrably at odds with congressional expressions of intent leading to enactment of CERCLA and the FRCD. The leading Senate bill drafted in the process of enacting CERCLA provided for recovery limited to medical costs incurred by persons injured through exposure to toxic substances to be paid out of CERCLA's environmental clean-up fund. S. 1480, 96th Cong., 2d Sess. § 6(a)(1)(M)(3)(A)(1980). This provision was not included in the final version of the House bill which became CERCLA, H.R. 7020, 96th Cong., 2d Sess. (1980). However, just prior to the Senate's passage of H.R. 7020, Senator George Mitchell addressed the Senate expressing his strong concern that the bill was "deficient because while it provides for the cleanup of places, and compensation for damage to things, it provides nothing for what is the most important part of the problem: injury to the people." 126 Cong.Rec. S 14973 (daily ed. Nov. 24 1980) (statement of Sen. Mitchell). Senator Mitchell further argued that "[o]ur failure to provide compensation from the fund for persons who are injured is even less defensible when we recall that S. 1480 provides liability only for out-of-pocket medical expenses. There would have been no compensation for the pain and suffering of an individual, or for the psychological damage he or she might sustain, *or for the ultimate loss, death.*" *Id.* at S 14,974 (emphasis added). It is well known that the CERCLA legislation as enacted was the product of much compromise as is demonstrated by comments contained in a letter from Senators Robert T. Stafford and Jennings Randolph to Representative James J. Florio, which accompanied H.R. 7020 as amended

---

**21.** · A perusal of the Yellow Pages of one of the two major Buffalo area telephone directories reveals at least a dozen advertisements in which the lawyer or law firm is promoted as handling personal injury claims. In each such advertisement, wrongful death is listed as a sub-category of a personal injury action. Typical is the full page advertisement for the law firm of a retired New York Court of Appeals judge which refers to such firm as "Personal Injury Attorneys." The advertisement further states in contrasting print that the firm's "Practice is Limited Exclusively to

Personal Injury & Accident Claims." Included among the fourteen types of cases handled by the firm is "Wrongful Death." The Talking Phone Book, 1997–98 ed., covering Erie County, at 603. Another high profile personal injury firm's advertisement is similar. *See id.,* at 563. At least twenty such advertisements indicate the law firm handles personal injury actions, with no mention of wrongful death actions. *See, id.* Further, in only three advertisements are wrongful death actions listed as a category separate from personal injury actions. *See, id.,* at 587, 588 and 590.

and passed by the Senate on November 24, 1980.[22] The § 301(e) study group provision contained in the version of H.R. 7020 passed by the Senate on November 24, 1980, S 1480, 96th Cong., 2d Sess. § 301(e) (1980), was the result of such compromise. Study Group Report at 6–9. This legislative history therefore provides at least some clear indication that among congress' motives in its determination to enact a comprehensive response to the damages caused by pollution was redressing the loss of human life.

The legislative history of SARA also supports this conclusion. As discussed, the § 301(e) Study Group Report influenced the SARA legislation, adopted six years later, which addressed CERCLA's unfinished business of providing "legal redress for harm to man." During congressional debate over SARA, then Senator Albert Gore proposed an amendment which would have permitted reimbursement from the Superfund for costs associated with personal injuries stating that "[d]amages of this nature are such things as *death* or the total destruction of one's property or chattel. *Most personal injury suits present damages like these.*" Cong. Comm. on Environment and Public Works, 97th Cong., 2d Sess., 352 (1983) (Statement of Sen. Gore) (emphasis added). To further assure this issue was addressed in the SARA legislation, Representative Barney Frank offered an amendment to create a federal cause of action for personal injuries, including death. 131 Cong.Rec. H11, 547–01 (daily ed. December 10, 1985) (statement of Rep. Frank). Because the SARA bill already included the FRCD, Representative John Breaux, in opposing the Representative Frank's amendment, stated that "[t]he amendment is not needed in light of evolving State law and the procedural reforms in [the FRCD]." 131 Cong.Rec. H11,547–01 (daily ed. Dec. 10, 1985)(statement of Rep. Breaux). Although his amendment was not accepted, Congressman Frank nevertheless

voted in favor of the final SARA bill which included the FRCD. 131 Cong.Rec. H11, 547–01 (daily ed. December 10, 1985) (roll-call vote). While admittedly not decisive, these comments indicate that at least these legislative leaders intended that SARA would deal with a major national problem left unresolved by CERCLA, the redress of claims for damages suffered by people as a result of exposure to hazardous substances, including damages where death results. Such legislative history is consistent with a finding that in enacting the FRCD Congress intended actions for personal injury brought under state law as including wrongful death actions.

Defendants contend that because the amendment offered by Representative Frank referred to actions for personal injury, illness and death, the failure to adopt this amendment demonstrates Congress must have conceived that the term "personal injury" as used in the FRCD, excludes, by contrast to the terminology of the proposed amendment, an action for death. Defendants' Memorandum of Law at 24. Defendants' theory ignores the fact that Representative Frank's proposed amendment would have created a special federal cause of action in federal court for toxic torts in the context of existing federal statutory causes of action which do specifically provide for personal injuries as well as death, including the Federal Employers' Liability Act, 45 U.S.C. §§ 51 *et seq.*, and the Jones Act, 46 U.S.C.App. § 678. However, the FRCD does not create a cause of action, rather, it provides for a uniform rule of accrual for toxic tort claims brought under state law. The right to bring such actions had already been granted under the laws of most of the states at the time the FRCD was enacted, Study Group Report, App. L. and that right extended to wrongful death claims based on toxic exposure with long term latency and effects upon the body, if otherwise timely. *See, e.g., Rothstein, supra.* Defen-

---

**22.** Specifically, the letter states "[o]n Monday, November 24, the Senate passed a compromise "superfund" bill and sent it to the House by a vote of 78 to 9. That the bill passed at all is a minor wonder. Only the frailest moment-to-moment coalition enabled it to be brought to the Senate floor and considered. Indeed, within a matter of hours that fragile coalition began to

disintegrate to the point that, in our judgment, it would now be impossible to pass the bill again, even unchanged." Letter from Senators Robert T. Stafford and Jennings Randolph to Representative James J. Florio (Dec. 2, 1980), *reprinted in* 1 Legislative History of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, at 774–75 (1980).

dants' argument therefore fails to explain why Congress would seek to apply the FRCD's more flexible discovery rule to personal injury actions based on then existing state law caused by exposure to toxic substances, but not to death actions. As discussed, *supra,* at 535–36, there is no reasonable basis to suppose Congress so intended. Accordingly, Defendants' argument unnecessarily emphasizes the differences between applicable periods of limitation for wrongful death and other tort actions under New York and other state law. If accepted, such technical distinctions would frustrate Congress' purpose in enacting the FRCD.

Defendants also rely on several state cases generally holding that, based upon the particular relevant accrual rules for state wrongful death actions, the discovery accrual rule should not be applied to wrongful death actions because to do so would judicially displace a clearly enunciated contrary rule established by the respective state's legislature. Defendants' Memorandum of Law, at 38–39 (discussing *Pobieglo v. Monsanto Company,* 402 Mass. 112, 521 N.E.2d 728 (Mass.1988); *Pastierik v. Duquesne Light Company,* 514 Pa. 517, 526 A.2d 323 (Pa.1987); *Trimper v. Porter – Hayden,* 305 Md. 31, 501 A.2d 446 (Md.1985)). A careful reading of these cases, however, reveals that the preemptive effect of a federal accrual rule on state statutory limitations periods was not at issue and the emphasis placed by those courts on the death of a victim as the proper accrual date for survival and death actions is unpersuasive where the issue is not what an individual state legislature may have intended, but how to give effect to an act of Congress.

For example, the court's reliance in *Pastierik,* upon the ability of a decedent's survivor to initiate scientific examinations necessary to definitively determine the cause of death, including autopsies which could not be performed on a living injured person. *Pastierik,* at 325, had already been rejected by other state and federal courts. In *White v. Johns–Manville Corp.,* 103 Wash.2d 344, 693 P.2d 687 (Wash.1985), the court held a wrongful death action commenced six years after the decedent's death was timely as commenced within the relevant three year

limitations period where the estate representative, decedent's widow, did not learn until four and one half years after her husband's death from a form of lung cancer that workplace asbestos exposure of over 30 years may have caused his death. Specifically rejecting assertions that autopsy reports and death certificates will inevitably reveal the cause of an occupationally related death based on exposure to toxic substances with long periods of latency, *White* at 693–97, the court noted that the research necessary to establish the causal link between various forms of cancer and hazardous occupational exposure requires "numerous years and vast resources." *Id.* at 694. The court found any unfairness associated with "unearthing" wrongful death actions based on later discovered facts by a decedent's representative establishing cause was outweighed by the hardship imposed on the survivors "unblamably left without a remedy," and extended the discovery accrual rule to the plaintiff's survival action allowing her to "step into the shoes" of the decedent to determine when the action accrued. *Id.* at 694–95. In *White,* the court pointed out that defendants' argument, similar to Defendants' argument here, that the survival action accrues upon the decedent's death confuses the existence of the cause of action with the accrual of the action for purposes of triggering the applicable period of limitations. *White* at 695. As the court stated, "... what survives to the personal representatives are not only the decedent's ripe causes of action but ... their potential causes of action which may not have accrued at the time of death." *Id. Accord Barrett v. United States,* 689 F.2d 324 (2d Cir.1982); *Hanebuth v. Bell Helicopter,* 694 P.2d 143 (Alaska 1984); *Myers v. McDonald,* 635 P.2d 84 (Utah 1981); *Coleman v. Hinsdale Emergency Medical Corp.,* 108 Ill.App.3d 525, 64 Ill.Dec. 91, 439 N.E.2d 20 (Ill.App.2d Dist.1982); *Maughan v. SW Servicing, Inc.,* 758 F.2d 1381 (10th Cir. 1985); *see also,* Zelin, *Time of Discovery as Affecting Running of Statute of Limitations in Wrongful Death Action, supra.,* §§ 4, 5 and 8.

In none of these latter cases do the courts identify any of the issues raised by Defendants here as obstacles to the application of the discovery rule to survival or wrongful

death actions based on the knowledge to be attributed to an injured decedent's representative. Equally significant is that it was against this background that Congress enacted the FRCD to establish a clear and uniform rule of accrual for toxic tort litigation in the state courts. Indeed, these cases, which precede the FRCD's enactment, exemplify the "evolving state law" which, as Representative Breaux argued against Representative Frank's proposed amendment in December 1985, negated the need for a federal cause of action for toxic torts including a death action. *See* Discussion, *supra,* at 536.

As discussed, failing to apply the FRCD to wrongful death actions produces an anomolous result when it is recalled that the FRCD also applies to property damage claims.[23] In New York, "[n]o cause of action for injury to person or *property* is lost because of the death of the person in whose favor the cause of action existed." N.Y.Est. Powers and Trusts Law § 11–3.2(b) (McKinney 1997) (emphasis added). Barring the FRCD's applicability to wrongful death actions, as Defendants argue, results in the situation Senator Mitchell warned of when the Senate rejected S. 1480, which included a provision for reimbursement of medical expenses of victims exposed to hazardous substances, in favor of H.R.7020 which ultimately became CERCLA. 126 Cong.Rec. S 14973 (daily ed. Nov. 24 1980) (statement of Senator Mitchell). As Senator Mitchell stated, "under this bill, if a toxic waste discharge injures both a tree and a person, the tree's owner, if it is a government, can promptly recover from the fund for the cost of repairing the damage, but the person cannot. In effect, at least as to the superfund, it's all right to kill people, but not trees." *Id.* As discussed, the purpose of SARA in general and the FRCD in particular was to assure that redress of injuries to people as well as to the environment because of exposures to hazardous substances would be equally available.

The court's finding that the FRCD extends to survival and wrongful death actions, and the concomitant absence of any persuasive reasons opposing such an extension, is consistent with the legislative judgment implied in the FRCD. The determination of inherently arbitrary statutory limits requires that legislatures "balance" the nature of the claimed injuries with the "surprise" factor, in this case, the extent to which the industry participants generate, transport and store the toxic substances, could justifiably claim ignorance of the dangerous character of the substances and surprise at being subjected to private claims beyond traditional statute of limitations rules. Study Group Report, at L–11. Accordingly, in enacting the FRCD Congress balanced the polluter's expectation of repose with the injured party's desire to be made whole. The consideration of any unfairness to a defendant in being required to defend such claims, regardless of whether the victim is alive or dead, extends equally to a plaintiff, whether a living victim or the representative of his estate or his beneficiary. There is, therefore, no reason to suppose Congress in enacting the FRCD intended to limit its benefits to cases involving only persons who survive their toxic exposures long enough to invoke it.[24]

As stated, the applicable limitations period for wrongful death actions under New York law is two years measured from the date of death. N.Y.Est. Powers & Trusts Law § 5–4.1 (McKinney 1981). Preempting that statute of limitations to the extent that it is inconsistent with the FRCD, *i.e.,* that § 5–4.1 provides for an accrual date earlier than the date plaintiff knew, or should have known the cause of the injury, yields two years within which to timely file a wrongful death action measured from the asserted FRCD, here, December 19, 1994. Accordingly, all the instant wrongful death claims, filed between January 10, 1995 and June 17, 1996, are timely if, as asserted by Plaintiffs, the correct FRCD is December 19, 1994. As the

---

**23.** *See* Discussion, *supra,* at 529.

**24.** The court notes that in *Wagar v. BASF Corporation,* 1990 WL 124069, *5 (N.D.N.Y.1990) relied on by Defendants, Defendants' Memorandum of Law, at 21 n. 14, the court held that

plaintiffs' breach of warranty claim was not within the scope of personal injury or property damages as defined under the FRCD. As no breach of warranty claim is asserted here, the court need not address that issue.

true FRCD, an issue of material fact, has not yet been established on this motion to be an earlier date, *i.e.,* more than one year prior to the filing of the instant actions, summary judgment dismissing the wrongful death actions should be DENIED.

## 2. *Constitutionality of 42 U.S.C. § 9658*

Defendants have challenged the constitutionality of the FRCD arguing it represents an exercise of congressional power beyond the limits of the Commerce Clause and also violates the Tenth Amendment. Defendants' Memorandum of Law, at 27. Plaintiffs assert that the FRCD was validly enacted pursuant to Congress' authority under the Commerce Clause and does not invade the sovereignty of the states. Plaintiffs' Memorandum of Law at 16, 20–21.

### a. *Commerce Clause Power*

The Commerce Clause of the United States Constitution grants Congress the power "[t]o regulate commerce ... among the several states...." U.S. Const., Art. 1, § 8, cl. 3. Whether a congressional act is valid under the Commerce Clause was recently determined in *United States v. Lopez,* 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), where the Supreme Court held that Congress exceeded its authority under the Commerce Clause by enacting the Gun–Free School Zone Act of 1990, 18 U.S.C. § 922(q) ("the Act"), which made possession of a firearm within a school zone a federal crime. There, the Court stated that the Commerce Clause permitted Congress to regulate and protect three broad categories of activity including (1) "the use of the channels of interstate commerce," (2) "the instrumentalities of the interstate commerce, or persons or things in interstate commerce," and (3) "those activities that substantially affect interstate commerce." *Lopez, supra,* at 557–59, 115 S.Ct. 1624. As there was no indication that possession of a gun within a school zone involved the channels or instrumentalities of interstate commerce or could be shown to have had any effect on interstate commerce, the Act could not be sustained under any of the three categories of permissible interstate regulation and was beyond

the scope of congressional power under the Commerce Clause. *Lopez, supra,* at 558–59, 115 S.Ct. 1624. In the instant case, Defendants similarly contend that the FRCD is not within any of these three forms of activities established by the Supreme Court as permissible for congressional regulation and protection under the Commerce Clause. Defendants' Memorandum of Law, at 28–29.

■ Channels of interstate commerce are defined as the routes of transportation. *See, Lopez, supra,* at 558, 115 S.Ct. 1624 (citing *Heart of Atlanta, Inc. v. United States,* 379 U.S. 241, 256, 85 S.Ct. 348, 13 L.Ed.2d 258(1964) (holding regulation of the interstate transportation of goods and passengers were well within the regulatory power of Congress under the Commerce Clause)). Instrumentalities of interstate commerce are defined as the means of interstate transportation. *Lopez, supra,* at 558, 115 S.Ct. 1624 (citing cases). As the FRCD does not directly or indirectly seek to regulate either the channels or instrumentalities of interstate commerce, its validity is not found within the first two categories of permitted Commerce Clause regulation.

■ Defendants also argue that the FRCD is not within the third category as *Lopez* requires an independent evaluation of the FRCD's constitutionality under the Commerce Clause based on legislative findings regarding the FRCD's effect on interstate commerce and here, as in *Lopez,* no such legislative findings exist to establish the constitutionality. Defendants' Reply Memorandum of Law at 11. Defendants further maintain that the FRCD is not an essential part of CERCLA as CERCLA's regulatory scheme for the clean up of hazardous waste sites would not be disrupted if the FRCD is not given effect and, as such, the FRCD's constitutionality cannot be measured based on the constitutionality of CERCLA itself. Defendants' Reply Memorandum of Law at 10–11 (citing *Lopez, supra,* at 561–64, 115 S.Ct. 1624).

■ Congress is not, however, required to establish by specific legislative findings that every detail of a complex federal regulatory program is constitutional if the chal-

lenged provision is "an integral part of the regulatory program and the regulatory scheme when considered as a whole" can be shown as "independently and directly related to a valid congressional goal." *Hodel v. Indiana,* 452 U.S. 314, 328 n. 17, 101 S.Ct. 2376, 69 L.Ed.2d 40 (1981) (regulation of prime farm land upheld under Surface Mining Act, 30 U.S.C. § 1201 *et seq.,* despite claim that amount of affected land constituted small portion of total national farm land acreage). In *Hodel,* the Supreme Court sustained the challenged regulation under the Commerce Clause because of the valid federal interest in protecting prime farm land as an essential link in the nation's food supply chain. *Hodel, supra,* at 335, 101 S.Ct. 2376. Additionally, given the broad objectives of CERCLA to remedy the defects of hazardous substances which have been discharged into the environment, "[t]o provide for liability, compensation, cleanup, and emergency response for hazardous substances released into the environment and the cleanup of inactive hazardous waste disposal sites," Comprehensive Environment Response, Compensation and Liability Act, 94 Stat. 2767, *reprinted in* 1 Legislative History of the Comprehensive, Environmental Response, Compensation and Liability Act of 1980, at 3 (1980), the court finds the FRCD is an essential part of CERCLA as Congress, by enlarging access to state court remedies through a partial preemption of state statutes of repose for actions based on exposure to toxic substances as defined in CERCLA, rationally sought to regulate activities which substantially affect interstate commerce.

It is undisputed that Defendants in the instant case who are alleged to have generated the hazardous substances located at the Landfill were involved in the manufacture and distribution of products for sale from which hazardous substances subject to CERCLA were by-products. The intimate connection between the generation, transportation, storage, and disposal, lawful or not, of hazardous wastes and interstate commerce is well-established. *Chemical Waste Management, Inc. v. Hunt,* 504 U.S. 334, 340 n. 3, 112 S.Ct. 2009, 119 L.Ed.2d 121 (1992). Private tort actions for personal injuries and property damage, including punitive damages, were viewed by the § 301(e) Study Group as effective mechanisms to remedy and deter future danger to public health from improper disposal of hazardous substances. Study Group Report, at 21–22. Thus, the possibility of suit for personal injury and property damage based on the disposal of such hazardous substances directly impacts a business organization's decision whether to participate in an industry which may subject the organization to liability for such claims. The threat of such private actions also creates an added incentive to strictly comply with requirements directed to reducing the risk of future damage to the environment and individuals resulting from exposure to regulated hazardous substances. As CERCLA broadly serves to remedy damage to the environment including navigable waters, surface and ground water, drinking water supply, land surface or subsurface strata and ambient air within the United States, *see* 42 U.S.C. § 9601(8), strengthening the capability of private persons to invoke state remedies for such resulting damage to persons and property caused by tortious conduct involving hazardous substances directly and substantially affects interstate commerce.

Additionally, in contrast to *Lopez* where the Supreme Court determined that the Gun–Free Zone statute at issue was *not* part of a larger regulatory scheme which had a substantial impact on interstate commerce, *Lopez, supra,* at 562–63, 115 S.Ct. 1624, here the FRCD is an integral part of CERCLA's regulatory scheme which has been held valid under the Commerce Clause as affecting interstate commerce. *United States v. Olin Corporation,* 107 F.3d 1506 (11th Cir.1997) (analyzing CERCLA in accordance with *Lopez* and holding that CERCLA as applied did not violate the Commerce Clause) [25]; *See*

---

**25.** Plaintiffs, relying on *Pennsylvania v. Union Gas Co.,* 491 U.S. 1, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989), assert that the constitutionality of CERCLA as a whole has been upheld by the Supreme Court. Plaintiffs' Memorandum of Law at 17–18. However, a careful reading of the decision in *Union Gas, supra,* reveals that there the Court only considered whether Congress in

*also Bolin v. Cessna Aircraft Co.,* 759 F.Supp. 692 (D.Kan.1991) (upholding the constitutionality of the FRCD under both the Commerce Clause and the Tenth Amendment). As discussed, provision of "legal redress for *harm to man*" was one of CERCLA's express purposes upon its enactment in 1980. 42 U.S.C. § 9651(e)(1) (emphasis added). *See also Kowalski v. Goodyear Tire and Rubber Co.,* 841 F.Supp. 104, 108 (W.D.N.Y.1994) (observing that the expeditious cleanup of toxic spills and recovery of cleanup costs are not the only goals of CERCLA).

In enacting SARA which, rather than creating a separate federal cause of action based on injuries attributable to toxic torts or encouraging the states to adopt a federal model for such actions, Congress included the FRCD provision creating a uniform accrual date for state toxic tort actions. As the FRCD preserves the legal remedies for state law claims in support of one of CERCLA's express purposes, which would otherwise be time-barred under the applicable state statutes of limitations, the FRCD is an integral part of the regulatory scheme of CERCLA.[26]

Additionally, the constitutionality of CERCLA under the Commerce Clause was recently sustained against an attack based on *Lopez* in *United States v. Olin Corporation,* 107 F.3d 1506 (11th Cir.1997). In *Olin,* the government sued Olin for cleanup and response costs pursuant to CERCLA, 42 U.S.C. §§ 9606(a) and 9607(a)(1)(A). Olin had manufactured mercury and chlorine-based commercial chemicals as its plant site which resulted in contamination of the land at the site. The record established that the contamination was limited to the site and had not contaminated the groundwater flows, although the resulting pollution rendered the site unfit for future residential use. In reversing the district court's decision that, as applied to those facts, CERCLA's cleanup and cost recovery provisions were unconstitutional under the Commerce Clause, the court of appeals acknowledged that Congress in enacting CERCLA did not make specific findings that the generation, transportation, and storage of hazardous wastes affected interstate commerce, nor did it specifically require an interstate jurisdictional element. *Olin, supra,* at 1510.

Where no such findings were made or jurisdictional element required by the legislation at issue, *Lopez* mandates the courts make an independent determination that the statute at issue regulates "activities that arise out of or are connected with a commercial transaction which, viewed in the aggregate, substantially affect [ ] interstate commerce." *Olin, supra,* at 1509 (citing *Lopez,* 514 U.S. at 561, 115 S.Ct. at 1631). Further, as to matters which on their facts are asserted to be exclusively of an intrastate nature,

enacting CERCLA intended to abrogate a state's sovereign immunity under the Eleventh Amendment to permit CERCLA actions to be maintained against the states. *Union Gas, supra,* at 10, 109 S.Ct. 2273. The Court never considered the constitutionality of CERCLA and, indeed, upon examining the petition for certiorari in that case, it is apparent that the issue was never presented to the Court. *See U.S. v. Union Gas Company,* 832 F.2d 1343 (3d Cir.1987), *petition for cert. granted* 485 U.S. 958, 108 S.Ct. 1219, 99 L.Ed.2d 420, Jan. 21, 1988, 56 LW 2268 (U.S. Mar. 22, 1988) (No. 37–1241). Specifically, the questions presented to the Supreme Court were (1) whether Congress intended to override the states' Eleventh Amendment immunity from suit by amending a definitional section of CERCLA, (2) if so, whether retroactive elimination of such immunity was permitted, and (3) "[w]hether Congress' power to override Eleventh Amendment immunity under the Commerce Clause is limited by the States' right to provide vital services without subjecting themselves to federal court jurisdiction, particularly where the events

forming the basis for suit occurred long before the federal scheme was enacted." *Id.* Accordingly, this court does not find *Union Gas* is precedent for the question of CERCLA's or the FRCD's constitutionality.

26. *Lopez* is further distinguishable from the issue presented here as in *Lopez* the Court struck down a criminal statute finding that to permit Congress to regulate, under the Commerce Clause, subjects traditionally within the exclusive domain of the state such as matters of substantive criminal law and education law would render almost any activity subject to federal regulation, *Lopez,* at 564, 115 S.Ct. 1624, contrary to the Founders intent and the terms of the Commerce Clause itself. In contrast to the subject matter at issue in *Lopez,* and as the court's discussion, *infra,* at 542–43, demonstrates, the regulation of private litigation involving toxic torts is a matter substantially affecting interstate commerce and therefore cannot be said to be a subject within the exclusive domain of the states.

to sustain the challenged statute the court must also find that the statute constitutes "an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." *Id.* In making this determination the court's focus cannot be excessively narrow, as if the statute "regulates a *class of activities* .... and that *class* is within the reach of the federal power, the courts have no power 'to excise, as trivial, individual instances' of the class." *Olin, supra*, at 1508 (quoting *Perez v. United States*, 402 U.S. 146, 154, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971)) (internal quotations omitted) (italics added).

The court in *Olin* found that the narrowest possible class in the case before it was the regulation of the on-site disposal of hazardous waste produced on-site and, based on the legislative history of CERCLA showing a "nexus between all forms of improper waste disposal and interstate commerce," *Olin, supra*, at 1511, and concluded that CERCLA's cleanup and cost recovery provisions were constitutionally applied to the Olin property at issue. *Olin, supra*, at 1511. For example, the court noted that the Senate Committee on Environment and Public works found a correlation between the growth of the chemical industry and the costs associated with the handling of its wastes. *Olin*, at 1511. Additionally, the same committee had also found that the chemical contamination from releases had resulted in substantial losses of farmland and commercial fishing, including half the annual potential fishing in the Great Lakes. *Id.* The committee further noted in its report that beyond the observed commercial damage from interstate traffic in hazardous wastes, similar damage was caused by accidents associated with the unregulated intrastate disposal of such wastes in tanks, lagoons and chemical waste plants. *Id.* Assessing these findings, the court went on to observe that if purely intrastate disposals of hazardous wastes were held beyond the reach of federal regulation, it would cause a severe imbalance in the hazardous waste disposal industry resulting in serious interstate economic effects on an aggregate basis. *Id.* at n. 11 (citing *Wickard v. Filburn*, 317 U.S. 111, 128–29, 63 S.Ct. 82, 87 L.Ed. 122 (1942)

(production limited to individual needs if aggregated substantially affects interstate commerce)). The court further noted that hazardous waste has long been recognized as an article of commerce. *Id.* (citing *Chemical Waste Management, Inc. v. Hunt*, 504 U.S. 334, 340 n. 3, 112 S.Ct. 2009, 119 L.Ed.2d 121 (1992)). The court therefore concluded that the regulation of on-site hazardous waste disposal substantially affected interstate commerce and was constitutionally applied to Olin.

In this case, the FRCD is directed to the litigation of claims for personal injury and property damage in the state courts where such claims arise from exposure to hazardous waste located in facilities defined by CERCLA. As held in *Olin*, Congress may impose liability for cleanup costs based on wholly intrastate disposals of hazardous wastes and, therefore, it may also regulate the harm to the environment resulting from such disposals created by both interstate and intrastate activities. If Congress can regulate harm to the environment it must also have the power to regulate such disposals when they result in harm to humans. It would be incongruous that the Commerce Clause allows Congress to protect crops and fish against damages resulting from toxic substances but not people. Private lawsuits to make whole people who have suffered such damages at the hands of wrongdoers is a form of regulation and compensation long recognized by the law. *Middle East Banking Co. v. State Street Bank International*, 821 F.2d 897, 902 (2d Cir. 1987). Just as Congress may establish statutes of limitations for such actions if they were allowed in federal court, *International Union, supra*, 383 U.S. 696 at 703, 86 S.Ct. 1107; *Oneida Indian Nation of New York, supra*, 470 U.S. 226 at 241, 105 S.Ct. 1245, or require the court to apply an analogous statute of limitations based on state law, *Reed v. United Transportation Union*, 488 U.S. 319, 323, 109 S.Ct. 621, 102 L.Ed.2d 665 (1989), Congress may, if its power reaches the subject matter, as it does here, also establish the method of accrual by which the timeliness of the claims is to be determined. That is what Congress did in enacting the FRCD and,

based on the reasoning in *Olin*, as to contamination of property, the FRCD represents an incident of federal regulation of the deleterious effects of the same hazardous substances and wastes on people and property.

To exclude congressional regulation of accrual rules even if limited to toxic torts arising from wholly intrastate releases of hazardous wastes would frustrate Congress purpose to provide greater access to the courts for injured parties as part of its comprehensive response to the national problem of controlling and remediating the effects of release of dangerous contaminants. Lack of uniformity in achieving redress in state courts for toxic torts would also lead to potential competitive imbalances in the hazardous wastes disposal industry based on differing schemes for invoking relevant statutes of repose. Therefore, the FRCD is an essential part of a national regulatory system established by CERCLA and represents a valid exercise of congressional power. *Olin, supra; Bolin, supra*, at 707 (finding according to pre-*Lopez* analysis that "Congress retains ample authority under the Commerce Clause to enact legislation regulation activities that result in the release of hazardous substances.")

Defendants nevertheless argue that Plaintiffs should not be permitted to "bootstrap" a determination of the constitutionality of the FRCD based upon the prior judicial determination of CERCLA's constitutionality particularly where the statute at issue represents a "sharp break" with prior law. Defendants' Memorandum of Law, at 30 (citing *Lopez, supra*, at 563, 115 S.Ct. 1624). Defendants' argument lacks merit for several reasons. First, as noted, CERCLA's constitutionality under the Commerce Clause has not been previously addressed by the Supreme Court. Second, the FRCD does not represent a "sharp break" with prior law as Congress has intervened on the subject of tolling state statutes of limitations in the past. For example, the Soldiers' and Sailors' Civil Relief Act of 1940, 50 U.S.C.App. § 525, tolls the states' statutes of limitations for any civil action or proceeding, in any court, by or

against any person in military service.[27] Further, Congress has often adopted state statutes of limitations to limit purely federally based private causes of actions. *Bolin, supra*, at 709 n. 17. Federal civil rights actions under 42 U.S.C. § 1983, are governed by state statutes of limitations, but the accrual of such action is measured with reference to federal rather than state law. *Cornwell v. Robinson*, 23 F.3d 694, 703 (2d Cir.1994). Accordingly, the FRCD, which modifies the operation of otherwise applicable state statutes of limitations only to the extent of establishing a uniform accrual date for the relevant cause of action arising from exposure to CERCLA defined hazardous substances, a subject of national concern, does not represent a sharp break with prior law, and, as such, the constitutionality of the FRCD need not be determined independently of CERCLA. This is particularly true where the advent of claims based on exposure to toxic substances now heavily regulated by both federal and state law, is relatively recent. Accordingly, the states' interests in having their accrual rules apply exclusively to this limited category of tort litigation cannot be said to be long-established and beyond the reach of Congress pursuant to its Commerce Clause powers.

As discussed, it was reasonably within Congress' competence to provide for a more limited test for accrual of state law based tort actions for personal injuries resulting from exposure to hazardous substances, in place of more restrictive state accrual requirements. The deterrent effect of such an accrual formula, if it had existed earlier, upon would-be polluters could have helped to prevent the well documented assaults on the nation's natural environment by toxic substance producing industries and others. It is within Congress' prerogative to include existing state law remedies as an integral part of CERCLA's otherwise predominantly federal regulatory scheme. This result is not affected by the fact that such federal reliance on state law involves modifying common law or statutory definitions of when a particular type of tort action, based on existing state

---

27. *See Falk v. Levy*, 180 F.2d 562, 564 (2d Cir. 1950) (although debtor made substantial payments on note prior to enlistment in the armed forces, the six-year statute of limitations governing the collection of debts was tolled during debtor's military service).

law, accrues and no more. For these reasons, enactment of the FRCD represents a proper exercise of Congress' Commerce Clause power.

### b. *Tenth Amendment*

 Defendants also argue that the FRCD violates the Tenth Amendment because it impermissibly directs states to regulate state common law tort claims in accordance with federal law by requiring states to provide a remedy for personal injuries, otherwise barred by its laws, caused by hazardous substances according to a federal standard. Defendants' Memorandum of Law, at 34. The court finds that the FRCD does not mandate that the states regulate anything in accordance with a federal standard, but rather preempts state statutes of limitations only to establish a uniform rule for the determination of the accrual date of state law toxic tort claims, which are covered by the FRCD, where the state limitations periods would commence to run earlier than permitted by the FRCD.[28]

The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited to it by the States, are reserved to the States respectively, or to the people." Tenth Amendment, U.S. Const. The Framers of the Constitution "explicitly chose a Constitution that confers upon Congress the power to regulate individuals, not States." *New York v. United States,* 505 U.S. 144, 166, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992). Thus, it was envisioned by the Framers that the citizens of the United States "would have two political capacities, one state and one federal, each protected from incursion by the other." *U.S. Term Limits, Inc. v. Thornton,* 514 U.S. 779, 838, 115 S.Ct. 1842, 131 L.Ed.2d 881 (1995).

 A two-step analysis is required to determine whether a congressional act violates the Tenth Amendment. *New York, supra.* First, the challenged action must be within one of Congress' specifically enumer-

ated powers. *Id.,* at 160, 112 S.Ct. 2408. As discussed, enactment of the FRCD is within Congress' power under the Commerce Clause. Second, where the challenged legislation is permissible as within one of Congress' enumerated powers, Congress must regulate by a method which does not impermissibly invade state sovereignty. *Id.,* at 160, 112 S.Ct. 2408. If Congress acts within its competence but invades state sovereignty, the enactment violates the Tenth Amendment. *Id.* In this case, the court finds that the FRCD by preempting specific state laws, rather than by mandating that states take legislative or executive action to regulate in accordance with federal law, meets this second criteria.

It is well established that Congress may, under the Supremacy Clause, U.S. Const. art VI, cl. 2, supersede or pre-empt conflicting state law provided Congress has validly exercised an enumerated power. *Barnett Bank of Marion County, N.A. v. Nelson,* 517 U.S. 25, 116 S.Ct. 1103, 1105, 134 L.Ed.2d 237 (1996); *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992). The Supremacy Clause provides that the laws of the United States "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary, notwithstanding." U.S. Const. art VI, cl. 2. As the court has found Congress' adoption of the FRCD was within the Commerce Clause power as defined by the Supreme Court, state law which conflicts with the FRCD may be preempted.

 "Congress' intent may be 'explicitly stated in the statute's language or implicitly contained in its structure and purpose.'" *Cipollone, supra,* at 516, 112 S.Ct. 2608 (quoting *Jones v. Rath Packing Co.,* 430 U.S. 519, 525, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977)). Where it is not expressly stated within the text of the statute that Congress intended the statute to preempt state law, preemption will be found in two situations,

---

28. Although not cited by either party in the instant motion, the court notes that the Second Circuit Court of Appeals recently questioned the constitutionality of the FRCD under the Tenth Amendment in *ABB Industrial Systems v. Prime Technology, Inc.,* 120 F.3d 351, 360 n. 5 (2d Cir.1997), but expressed no opinion on the issue as such was not before the court. Here, the court is presented with that specific issue and, therefore, addresses it.

specifically where Congress (1) evidences an intent to completely occupy a given field, or (2) enacts a law under which "it is impossible to comply with both state and federal law," or "the state law stands as an obstacle to the accomplishment of the full objectives of Congress." *Silkwood v. Kerr–McGee Corp.*, 464 U.S. 238, 248, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984). In analyzing the preemptive effect of federal legislation, "[t]he purpose of Congress is the ultimate touchstone." *Retail Clerks Intern. Ass'n, Local 1625, AFL–CIO v. Schermerhorn*, 375 U.S. 96, 103, 84 S.Ct. 219, 11 L.Ed.2d 179 (1963).

Here, no preemptive effect of the FRCD is demonstrated under the first test requiring complete occupation of a field as Congress specifically provided that an action commenced under CERCLA does not prevent further liability to the state or by operation of state law. 42 U.S.C. § 9614(a). Thus, the potential liability of persons subject to CERCLA's scope of remedies defined by CERCLA is not completely circumscribed by CERCLA. Rather, CERCLA preserves state causes of action for personal injury and property damage and the FRCD by its terms operates on state accrual rules only in cases of personal injury and property damage provided by the FRCD with respect to exposure to hazardous substances as defined by CERCLA.

Nor is there any merit to Defendants' assertion that the FRCD unconstitutionally directs states to regulate in accordance with federal law. Defendants' reliance on *Printz v. United States*, 521 U.S. 98, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997), is misplaced. In *Printz*, the Court held that provisions of the Brady Handgun Violence Protection Act of 1993, 107 Stat. 1536, § 102, requiring state and local law enforcement officials to conduct background checks on prospective handgun purchasers violated the Tenth Amendment, finding the challenged provisions analogous to federal "commandeering of state government" because they compelled the states to implement a federal regulatory program by legislation or executive action. *Printz, supra*, at 2379, 117 S.Ct. 2365. Significantly, in *Printz*, the Court held the challenged act impugned the sovereignty of the states by directing the actions of state agents in their official capacities rather than the actions of private citizens. *Printz, supra*, at 2380, 117 S.Ct. 2365.

In contrast to the provisions of the Brady Bill vitiated in *Printz*, the FRCD does not compel or direct states or state officials, legislative or executive, to regulate anything. Enforcement of the FRCD does not on its face or in its effect require executive or legislative actions in any form. Instead, the FRCD directs that where state law already provides for a cause of action for personal injury or property damage attributable to an exposure based on defendant's release of a hazardous substance, such cause of action accrues, and thus the applicable statute of limitations commences, no earlier than "the date the plaintiff knew (or reasonable should have known)" that the personal injury or property damages were caused or contributed by such hazardous substance. 42 U.S.C. § 9658(b)(4)(A). Indeed, it remains possible for the states to modify their substantive rules and related statutes of limitations regarding such toxic tort cases as they may find necessary. If, however, the subject of a valid exercise of congressional power, here toxic tort accrual rules, is preempted by federal law, it is no violation of the Tenth Amendment. *Printz, supra*, at 2381, 117 S.Ct. 2365; *New York, supra*, at 166. While as discussed, *supra*, at 522–23, Congress' decision to utilize state tort actions as a complementary means to achieve the broad objectives of CERCLA may be seen as a form of regulation, it remains the fact that such regulation is permissible as not impinging upon the broad sovereign discretion of state executive and legislative action protected against federal incursion by the Tenth Amendment.

 Further, it is well established that where Congress requires access to state courts, no Tenth Amendment violation occurs. *Testa v. Katt*, 330 U.S. 386, 393, 67 S.Ct. 810, 91 L.Ed. 967 (1947) (holding that the policy of the federal law is the prevailing policy in every state, and, as such, a claim based on a valid federal law must be enforced in accordance with the federal law over an established, but conflicting, state pol-

icy); *New York, supra,* at 178–79, 112 S.Ct. 2408 (distinguishing between a federal statute which mandates state regulation of an area of law in accordance with federal law and a federal statute which directs state enforcement of a federal law, explaining that federal statutes which were "enforceable in state courts do, in a sense, direct state judges to enforce them, but this sort of federal 'direction' of state judges is mandated by the text of the Supremacy Clause"). Additionally, the Supreme Court reiterated in *Printz* that the Supremacy Clause permitted Congress to preempt a field of state law. *Printz, supra,* at 2381, 117 S.Ct. 2365. It is also well established that Congress may direct state courts adjudicate claims created by federal law. *Howlett v. Rose,* 496 U.S. 356, 369, 374, 110 S.Ct. 2430, 110 L.Ed.2d 332 (1990) (holding that federal law, as the "law of the Land" is also the law of the states and that "[t]he Supremacy Clause forbids state courts to disassociate themselves from federal law because of disagreement with its content or a refusal to recognize the superior authority of its source"). As it is permissible for a federal statute representing an exercise of an enumerated power to direct its enforcement by a state court under the Supremacy Clause, it follows that it is permissible for a federal statute, like the FRCD, to direct enforcement by a state court applying state law. Accordingly, the FRCD whether by its preemptive effect or its own terms does not violate the Tenth Amendment.

### 3. *Commencement of Survival and Wrongful Death Actions Without a Duly Appointed Personal Representative of Decedents' Estate*

 Defendants seek dismissal of the survival and wrongful death actions brought on behalf of several decedents for whom no personal representative has yet been duly appointed.[28] Defendants' Memorandum of Law, at 45–46. Appointment of a proper legal representative of the decedent's estate is a prerequisite to survival and wrongful death actions based on the decedent's personal injuries. *Carrick v. Central General Hospital,* 51 N.Y.2d 242, 434 N.Y.S.2d 130, 414 N.E.2d 632, 636 n. 2 (N.Y.1980) (under New York law, "[i]t is well established that the existence of a qualified administrator is essential to the maintenance of the action and that the statutory right to recover for wrongful death does not even arise until an administrator has been named through the issuance of letters of administration"); *Mingone v. State,* 100 A.D.2d 897, 474 N.Y.S.2d 557, 560 (App.Div.2d Dep't.1984) (survival actions).

Plaintiffs do not dispute that the estates specified by Defendants as subject to the motion are without duly appointed personal representatives. Initially, Plaintiffs stated their intention to voluntarily dismiss the claims for whom no representative of the estate had been duly appointed when such actions were commenced, have personal representatives appointed for those estates, and then recommence those actions within six months of the voluntary dismissal, as permitted under New York Civil Practice Law and Rules § 205(a) ("§ 205(a)"). Plaintiffs' Response in Opposition to Summary Judgment, at 23. Upon reconsideration of § 205(a), however, Plaintiffs indicated, by letter to the court dated October 28, 1997, that they would not voluntarily dismiss those claims, but rather requested the court dismiss such claims in accordance with Defendants' motion. Plaintiffs' change of position was motivated by a more precise reading of § 205(a) which provides

[i]f an action is timely commenced and is terminated *in any other manner than by a voluntary discontinuance,* a failure to

---

**28.** At the time their respective actions were commenced, neither Letters Testamentary nor Letters of Administration had been issued to any personal representative for the estates of Evo T. Astor, Loraine R. Brzezicki, Gretchen A. Heaney, Anthony J. Marino, Robert A. Martzolf, Vincent J. Mongiovi, Alfred G. Mucna and Joseph J. Wiedenbeck. The persons suing on behalf of the estates of Isabelle A. Wiedenbeck and Mary M. Sturm were not the "duly appointed estate representatives" for those persons at the time the instant actions were commenced. Additionally, claims were filed on behalf of Charles W. Batt, Rose E. Batt and Joseph A. Inzinna before any estate representative had been appointed by the appropriate Surrogate Court. Defendants Memorandum of Law, at 45. Plaintiffs do not dispute these facts. Plaintiffs' Memorandum of Law, at 23.

obtain personal jurisdiction over the defendant, a dismissal of the complaint for neglect to prosecute the action, or final judgment upon the merits, the plaintiff ... may commence a new action upon the same transaction or occurrences or series of transactions or occurrences within six months after the termination provided that the new action would have been timely commenced at the time of commencement of the prior action and that service upon defendant is effected within such six-month period.

N.Y.Civ.Prac.L. & R. § 205(a) (McKinney 1997) (emphasis added).

Accordingly, voluntary dismissal of the claims brought on behalf of decedent's estates for which no personal representative has been duly appointed will preclude Plaintiff from recommencing such actions.

Defendants further argue that because the statutes of limitations for wrongful death and survival actions are not tolled pending the issuance of Letters Testamentary or Letters of Administration, those actions are nonetheless time-barred because the lack of a duly appointed personal representative of those estates is the lack of an essential element of those claims, rendering them nullities *ab initio*, and thus also making § 205(a) irrelevant. Defendants' Memorandum of Law, at 46. Defendants rely on *Baez v. New York City Health and Hospitals Corp.*, 80 N.Y.2d 571, 592 N.Y.S.2d 640, 607 N.E.2d 787 (N.Y.1992) (no toll available pending appointment of guardian for infant children distributees where decedent's will named executrix of estate as guardian of her children who could have sought appointment as personal representative to initiate timely action on behalf of children); *Ortiz v. Hertz Corp.*, 212 A.D.2d 374, 622 N.Y.S.2d 260 (App.Div. 1st Dep't. 1995) (wrongful death statute of limitations not tolled as to decedent's minor children pending receipt of letters of administration by legal guardian); and *D'Angelo v. City of New York*, 929 F.Supp. 129, 132 n. 3 (S.D.N.Y.1996) (two year statute of limitations tolled until appointment of guardian for infant child, sole estate distributee, but action dismissed as not commenced within two years of such appointment), in support of

their position that the statute of limitations is not tolled pending the appointment of the personal representative of an estate, which is required as an essential element to maintain wrongful death and survival actions. Defendants reason, therefore, that even if the FRCD applies to survival and wrongful death actions, the fact that proper representatives were appointed after expiration of the relevant statute of limitations periods renders such claims time barred under applicable New York law.

Assuming, *arguendo*, that the instant claims were timely commenced based on the FRCD, *Baez, Ortiz,* and *D'Angelo, supra,* are distinguishable as in those cases the actions were not commenced by a duly appointed representative of the decedent's estate until *after* the expiration of the statute of limitations and there was thus no prior action to which § 205(a) could relate. In contrast, *Carrick, supra,* held that if the action was originally timely commenced with reference to the applicable statute of limitations, albeit improperly for lack of a duly appointed estate representative, § 205(a) may nevertheless be invoked to permit the refiling of such an action upon the subsequent appointment of a representative of the estate. Specifically, the Court of Appeals held that § 205(a) is intended to apply in situations where a prior action is properly dismissed based on some "fatal flaw." including prior actions which contain a "deadly defect," such as a lack of a duly appointed estate representative, an essential element of both survival actions and wrongful death claims. *Carrick supra,* at 635. Thus, in *Carrick,* the court permitted a duly appointed representative of an estate to recommence survival and wrongful death actions within six months of dismissal of the prior actions, regardless of the absence of a duly appointed representative when the action was initially commenced.

Although technically one for summary judgment, Defendants' current motion pursuant to Fed.R.Civ.P. 56, reads as a motion pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim. Specifically, the motion states "[b]ecause no duly appointed estate representative had been appointed for the[se] decedents ... when the actions were com-

menced, the wrongful death and survival actions purportedly asserted on their behalf must be dismissed." Defendants' Memorandum of Law at 46. The court as to this issue therefore treats it as such. Accordingly, the survival and wrongful death claims pertaining to decedents Astor, Brzezicki, Charles Batt, Rose Batt, Heaney, Inzinna, Martzolf, Mongiovi, Mucha and Sturm, as they were filed prior to the appointment of personal representatives of the respective estates. based upon this failure to state a claim under New York law, should therefore be DISMISSED, with leave to re-file in accordance with § 205(a). However, as the court is recommending dismissal of the survival claims pertaining to decedents Marino and Isabelle and Joseph Wiedenbeck based on their having been filed more than one year after the latest possible FRCD, see Discussion, *supra*, at 36, only the wrongful death actions pertaining to those decedents should be DISMISSED with leave to re-file in accordance with § 205(a).

### 4. *Punitive Damages*

As stated, the instant Plaintiffs have filed survival actions, wrongful death actions, and claims for loss of consortium. Defendants contend that under New York law, punitive damages are recoverable only if the underlying cause of action supports such an award. Specifically, Defendants argue that if the underlying survival and wrongful death actions are time-barred, no underlying cause of action remains to support an award of punitive damages. Defendants' Memorandum of Law, at 46–47. Defendants also maintain that the Plaintiffs' punitive damages claims are legally insufficient as punitive damages are not available unless the defendant acted with wrongful intent and with a degree of recklessness similar to criminality. *Id.* at 47–48, *citing* Astor Complaint (Doc. # 1, 95–CV–247E(F)) at ¶ 71. Defendants therefore urge that Plaintiffs' allegations that Defendants' actions "were grossly, recklessly and wantonly negligent and were done with utter disregard for the rights and safety of plaintiffs and other persons similarly situated" should be dismissed. *Id.* Finally, Defendants maintain that at a minimum, Plaintiffs' punitive damages claims for survival actions are barred as to those decedents whose death occurred on or before August 31, 1982 when the New York survival statutes, N.Y. Est. Powers & Trusts Law §§ 5–4.3(b) and 11–3.2(b) (McKinney 1997), were amended to permit punitive damages in survival actions. *See* 1982 N.Y. Laws 100, §§ 1 and 2; Defendants' Memorandum of Law, at 49.

No separate cause of action for punitive damages exists under New York law and, accordingly, punitive damages may be recovered only if such damages are available upon establishing the underlying claim. *Porter v. Allstate Insurance Co.*, 184 A.D.2d 685, 585 N.Y.S.2d 465, 466 (App.Div.2d Dep't. 1992). However, in this case, as it is not possible at this time to determine whether most of the survival and wrongful death actions will ultimately be found to be timely, Defendants' assertion that all punitive damages claims must be dismissed because the underlying claims are time-barred fails in part.

Chapter 100 of the Laws of 1982 amended N.Y. Est. Powers & Trust Law §§ 5–4.3(b) and 11–3.2(b) to permit recovery of punitive damages in survival and wrongful death actions where the death of the decedent occurs after August 31, 1982. See 1982 N.Y. Laws 100, §§ 1 and 2. Accordingly, no punitive damages may be recovered in the survival and wrongful death actions pertaining to Evo T. Astor (date of death ("D.O.D.") December 2, 1980), Charles W. Batt (D.O.D. October 7, 1974), Joseph A. Inzinna (D.O.D. October 27, 1976), George Pagels (D.O.D. September 9, 1980), Leo N. Phillips (D.O.D. November 2, 1963), and Mary M. Sturm (D.O.D. December 15, 1966). In contrast, punitive damages may thus, depending on the correct FRCD, be awarded for the survival and wrongful death actions maintained on behalf of those decedents who died after the enactment of New York's punitive damages statutes relating to survival and wrongful death actions specifically, Rose E. Batt (D.O.D. October 4, 1982), Lorraine R. Brzezicki (D.O.D. August 23, 1992), Mary Jane Farino (D.O.D. September 18, 1991), Robert L. Farino (D.O.D. July 4, 1989), Stephen C. Grandillo (January 6, 1991), Gretchen A. Heaney (D.O.D. April 26, 1984), Nelson M.

Hirsch (D.O.D. November 17, 1993), Henry A. Kuczka (D.O.D. July 29, 1985), Robert A. Martzolf (D.O.D. March 23, 1987), Vincent J. Mongiovi (D.O.D. October 31, 1985), and Alfred G. Mucha (D.O.D. November 20, 1986). Punitive damages may also be recovered with regard to the wrongful death actions of pertaining to decedents Anthony J. Marino (D.O.D. February 6, 1988), Isabelle A. Wiedenbeck (D.O.D. August 17, 1993) and Joseph J. Wiedenbeck (D.O.D. July 1, 1991), for whom the survival actions were untimely filed. *See* Discussion, *supra*, at 36. Defendants' motion for summary judgment dismissing Plaintiffs' punitive damages claim should therefore be GRANTED in part and DENIED in part.

**5. *Derivative Loss of Consortium Claims***

 Defendants maintain that Plaintiffs' derivative loss of consortium claims [29] must be dismissed as there is no loss of consortium claim for the death of a spouse in New York. Defendants' Memorandum of Law, at 49. Additionally, Defendants assert that as a loss of consortium claim is derivative in nature, it must be dismissed where the underlying personal injury claim is dismissed. *Id.*

 In support of their position, Defendants rely on *Liff v. Schildkrout*, 49 N.Y.2d 622, 427 N.Y.S.2d 746, 404 N.E.2d 1288 (N.Y. 1980), which held that a cause of action for loss of consortium is derivative of a survival action for the marital partner's conscious pain and suffering, but is not derivative, nor may it be asserted as an element of, a wrongful death action. In *Liff*, the court held that such a loss of consortium claim is stated only insofar as a surviving spouse attempts to recover loss of consortium for the period prior to death of the marital partner. *Liff, supra*, at 1291. In response, Plaintiffs maintain that Defendants' summary judgment motion as to this issue is premature as Plaintiff have yet to be permitted to conduct any merit-based discovery which may or may not reveal any basis for such claims. Plaintiff's Memorandum of Law in Response in Opposition to Partial Summary Judgment, at 24.

It is basic that summary judgment may not be entered until the parties have had adequate time to conduct discovery on the merits of the issues presented on such motion. Fed.R.Civ.P. 56(c); *Celotex, supra*, at 322, 106 S.Ct. 2548. In the instant case, although Defendants' assertion that no loss of consortium claim may be maintained derivative of a wrongful death action is correct, it is possible that discovery will reveal evidence sufficient to support a loss of consortium claim derivative of decedents' pain and suffering prior to death, *i.e.*, relating to the survival actions, which is permitted under New York law. *Liff, supra*, at 1292. To that extent, Defendants' motion is premature and should be DISMISSED with leave to refile after completion of discovery related to such claims. Such discovery has been effectively stayed by this court's Second CMO.

### *CONCLUSION*

Based on the foregoing, Defendants' motion for partial summary judgment should be GRANTED in part and the survival actions pertaining to decedents Anthony J. Marino, Isabelle A. Wiedenbeck and Joseph J. Wiedenbeck should be DISMISSED. Summary judgment should be DENIED as to the survival actions of Mary Jane Farino, Robert L. Farino, Stephen C. Grandillo, Nelson M. Hirsch, Henry A. Kuczka, George Pagels and Leo N. Phillips. The survival and wrongful death actions commenced on behalf of Evo T. Astor, Charles W. Batt, Rose E. Batt, Loraine E. Brzezicki, Gretchen A. Heaney, Joseph A. Inzinna, Robert A. Martzolf, Vincent J. Mongiovi, Alfred G. Mucha and Mary M. Sturm, decedents for whom no personal representative had been duly appointed prior to being filed, should be DISMISSED with leave to renew. Summary judgment as to the remaining wrongful death actions should be DENIED. Summary judgment as to the punitive damages claims should be GRANTED in part and DENIED in part and summary judgment as to the claims for loss of consortium should be DENIED.

---

**29.** The court notes that loss of consortium claims have been asserted only with regard to Evo T. Astor, Henry A. Kuczka, Anthony J. Marino, Rob-

ert A. Martzolf, Vincent J. Mongiovi, Alfred G. Mucha, George Pagels, Leo N. Phillips.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of receipt of this Report and Recommendation in accordance with the above statute, Rules 72(b), .6(a) and 6(e) of the Federal Rules of Civil Procedure and Local Rule 72.3.

*Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.* Thomas v. Arn, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir.1989); *Wesolek v. Canadair Limited*, 838 F.2d 55 (2d Cir.1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Plaintiffs and the Defendants.

SO ORDERED.

March 11, 1998.